IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-874 (SLR) (SRF) |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF MERCK SHARP & DOHME CORP.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Nicolas Barzoukas
Joshua Davis
Lisa Thomas
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

April 23, 2015

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. SUMMARY OF THE ARGUMENT .......... 2

1. "[Mometasone furoate] monohydrate" (Claim 1) and "mometasone furoate monohydrate" (Claim 6) .......... 2
2. "Pharmaceutical composition comprising mometasone furoate monohydrate" (Claim 6) .......... 2

III. BACKGROUND OF THE TECHNOLOGY AT ISSUE .......... 3

IV. LEGAL STANDARDS .......... 5

V. ARGUMENT .......... 7

A. Defining The Level of Ordinary Skill in The Art .......... 7

B. Agreed-Upon Construction .......... 7

C. Disputed Constructions .......... 7

1. "[Mometasone furoate] monohydrate" and "mometasone furoate monohydrate" .......... 7
2. "Pharmaceutical composition comprising mometasone furoate monohydrate" .......... 13

VI. CONCLUSION .......... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Elcommerce.com, Inc. v. SAP AG*,
2011 WL 710487 (E.D. Pa. Mar. 1, 2011) ....................5

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....................6, 16

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) ....................5

*Merck Sharp & Dohme Corp. v. Xellia Pharm. APS*,
No. 14-199, 2015 WL 82386 (D. Del., Jan. 6, 2015)....................10, 11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................5, 6, 15

*Roche Palo Alto LLC v. Ranbaxy Labs. Ltd.*,
No. 06-2003, 2009 WL 3261252 (D.N.J. Sept. 30, 2009)....................10

*Schering Corp. v. Apotex Inc.*,
C.A. No. 09-6373-PGS, 2012 WL2263292, at *15 (D.N.J. June 15, 2012) ....................7

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005)....................10

*SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*,
336 F.3d 1298 (Fed. Cir. 2003)....................6, 16

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S.Ct. 831 (2015) ....................5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997)....................5

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)....................6

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*,
19 F.3d 1418 (Fed. Cir. 1994)....................9, 13

Plaintiff Merck Sharp & Dohme Corp. ("Merck") respectfully submits its opening claim construction brief.

## I. INTRODUCTION

Merck has asserted six claims of U.S. Patent No. 6,127,353 ("the '353 patent") against Defendant Teva Pharmaceuticals USA, Inc. ("Teva"): Claims 1, 6, and 9-12 (collectively, the "Asserted Claims"). The language of those six claims is facially clear, and Merck believes that every claim term contained therein would be readily understood by a person of skill in the art, and therefore, should be ascribed its plain and ordinary meaning. Teva, however, has identified three claim terms that it believes should be construed by the Court. This Court has made clear that in the case of disputed terms, "[r]esorting to 'plain and ordinary' meaning is not sufficient," D.I. 31 at 5 n.7, and thus, Merck has sought to provide proposed constructions that elucidate the plain and ordinary meaning of the disputed terms. As described in greater detail below, the parties do not dispute the actual meaning of these claim terms, but Teva's proposed constructions are improper because they incorporate into the terms additional limitations that have no basis in the actual claim language and introduce ambiguity and uncertainty into facially clear claim language.

Of the three claim terms Teva identified for construction, the parties have reached an agreement as to the meaning of one term, "9α,21-dichloro-16α-methyl-1,4-pregnadiene-11β,17α-diol-3,20-dione-17-(2'-furoate)," which the parties agree should be construed as "mometasone furoate." For the remaining two terms in dispute—"[mometasone furoate]/mometasone furoate monohydrate" and "pharmaceutical composition comprising mometasone furoate monohydrate"—the parties propose nearly identical language in their respective constructions, with the only exceptions being further limitations that Teva seeks to import into each of the

terms. The first disputed term appears in both independent claims at issue in this case, Claims 1 and 6, whereas the second disputed term appears only in Claim 6. For each disputed term, the intrinsic record, Federal Circuit precedent, and logic support Merck's proposed construction, and refute Teva's proposed construction.

## II. SUMMARY OF THE ARGUMENT

Teva's attempts to import improper limitations into the plain language of the claims cannot be allowed for at least the following reasons:

**1. "[Mometasone furoate] monohydrate" (Claim 1) and "mometasone furoate monohydrate" (Claim 6)**

(i) The parties agree that "mometasone furoate monohydrate" needs no further construction, as both proposed constructions include the phrase "mometasone furoate monohydrate." Teva's construction, however, improperly seeks to further limit the claims to mometasone furoate monohydrate "that is not formed spontaneously from anhydrous mometasone furoate in aqueous suspension."

(ii) Claims 1 and 6 are directed to mometasone furoate monohydrate and pharmaceutical compositions containing mometasone furoate monohydrate, ***not*** methods of manufacturing the claimed compound. Therefore, these claims cannot be restricted to only compounds or compositions made in a particular manner.

(iii) Teva's construction would limit Claims 1 and 6 such that the claims would not even cover mometasone furoate monohydrate or compositions thereof formed according to the manner in which mometasone furoate monohydrate was first discovered, as described in the specification of the '353 Patent.

(iv) Teva's construction introduces ambiguity into an otherwise clear claim.

**2. "Pharmaceutical composition comprising mometasone furoate monohydrate" (Claim 6)**

(i) Here again, the parties generally agree on the construction of the words actually appearing in the claim, with both parties' constructions being identical except for Teva's attempt to require a specific amount of mometasone furoate monohydrate be present in

the claimed pharmaceutical composition, a restriction that has no basis in the claim language.

(ii) Teva did not propose that "mometasone furoate monohydrate" should be defined to include a requirement on the amount of mometasone furoate monohydrate present. And based on the usage of "pharmaceutical composition comprising" in other claims of the '353 patent, it is clear that such a limitation also is not inherent in that portion of the disputed term. Therefore, there is no basis for incorporating such a limitation into the disputed term.

(iii) This is further bolstered by the incorporation of a limitation on the amount of mometasone furoate monohydrate that must be present in Claim 7, which depends from Claim 6, especially because that limitation is that only thing that distinguishes dependent Claim 7 from Claim 6.

## III. BACKGROUND OF THE TECHNOLOGY AT ISSUE

Merck is an innovator company that develops and markets pharmaceutical products. One such product is Merck's Nasonex® nasal spray, which provides millions of people with a safe and effective treatment for allergic rhinitis and related conditions. Merck's Nasonex® nasal spray is the embodiment of the Asserted Claims of the '353 patent, which are directed to a novel crystalline compound, mometasone furoate monohydrate, and to its pharmaceutical compositions. Over the past few decades, Merck has made substantial investments in the research and development of new pharmaceutical products, stimulating innovative work and prompting new inventions that have resulted in products that treat various diseases and have led to many patents. The '353 patent is, like many of Merck's patents, the result of such investment and reflects many years of arduous work and research.

In particular, the '353 patent represents the culmination of years of work invested in trying to develop a stable nasal spray formulation with a corticosteroid—mometasone furoate.

Mometasone furoate was originally discovered in the early 1980s by a Merck scientist[1] named Elliot Shapiro, whose work regarding this effort is described in U.S. Patent No. 4,472,393. At that time, and for several years afterwards, only a single form of mometasone furoate was known, anhydrous mometasone furoate. *See* '353 Patent at 1:14-29. But when Merck scientists began investigating the potential for using the difficult-to-work-with anhydrous mometasone furoate in prototype nasal spray formulations, the scientists' determination to find a stable formulation eventually led to the discovery of a novel crystalline form of mometasone furoate that could stand up to the demands of such formulations, mometasone furoate monohydrate. *Id.* at 1:14-49.

Having finally discovered a stable form for its formulation, Merck was able to receive regulatory approval for its Nasonex® nasal spray and has since enjoyed considerable success as a result of providing substantial relief to patients. This success, however, has spurred interest from many generic drug companies, such as Teva. Teva filed an Abbreviated New Drug Application ("ANDA") to sell a generic version of Merck's Nasonex® nasal spray in order to take advantage of the market for mometasone furoate nasal spray created and developed by Merck. On May 22, 2014, Teva provided notice of its ANDA to Merck and informed Merck that the ANDA contained a paragraph IV certification that the '353 patent, which is listed in the Orange Book as covering Merck's Nasonex® nasal spray, "is invalid, unenforceable, or will not be infringed." D.I. 1 at ¶13. Teva contends that anhydrous mometasone furoate is used in its ANDA product, but Merck will prove that at least some portion of the anhydrous mometasone furoate converts to the infringing monohydrate form in Teva's ANDA product.

---

1 At the time, Merck was known as Schering Corporation, but in 2012, Schering Corporation and another, preexisting Merck entity merged. The Schering Corporation was renamed Merck Sharp & Dohme.

A detailed understanding of the science behind the remarkable stability of mometasone furoate monohydrate and the conversion of anhydrous mometasone furoate to mometasone furoate monohydrate under certain conditions is not necessary at this time, because as explained in greater detail below, the parties generally do not disagree as to the substantive meaning of disputed claim terms. Instead, the disputes center upon whether Teva should be allowed to import into the claims additional, unrelated limitations not found in or supported by the claim language.

## IV. LEGAL STANDARDS

Claim construction is a question of law to be decided by the Court. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837-839 (2015); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). A court construes claim terms in light of their ordinary and customary meanings as understood by a person of ordinary skill in the art, who reads them in the context of the intrinsic record, at the time the patent application was filed. *Phillips v. AWH Corp*., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Regardless, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention." *Id.* The words in a claim are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention." *Id.* at 1312-13.

"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Straightforward terms should thus be given their plain meaning, not replaced with other words under the guise of "construction." *See, e.g., Elcommerce.com, Inc. v. SAP AG*, 2011 WL 710487, at *6 (E.D. Pa. Mar. 1, 2011) ("a

court may resolve [claim construction disputes] by simply instructing the jury to evaluate a term in light of its 'plain and ordinary meaning'").

When the meaning of a claim term is in doubt, however, the patent's specification can be consulted to provide guidance. *Phillips*, 415 F.3d at 1312–13. For example, a construction that excludes a preferred embodiment described in the specification "is rarely, if ever correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Similarly, while "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the disputed term and its relation to the claim at issue and other claims must be considered as well. *Phillips*, 415 F.3d at 1314. For example, "[o]ther claims of the patent in question, both asserted and unasserted, can . . . be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted). "Differences among claims can also be a useful guide." *Id.* "As [the Federal Circuit] has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not present in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). To that end, while the Federal Circuit has recognized that the doctrine of claim differentiation "is not a hard and fast rule of construction," the presumption that each claim in a patent has a different scope "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003).

## V. ARGUMENT

### A. Defining The Level of Ordinary Skill in The Art

Merck believes that the relevant art and level of ordinary skill in the art should be defined consistently with the level of ordinary skill determined in *Schering Corp. v. Apotex Inc.*:

> [A] PHOTISA [sic] skilled in the art pertaining to the '353 patent is a person actively involved in the drug development process . . . a multidisciplinary process that requires collaborative teamwork from persons with various experience . . . in medicine, nasal pharmacology, medicinal chemistry, physical chemistry, drug formulation, and drug delivery.

C.A. No. 09-6373-PGS, 2012 WL2263292, at *15 (D.N.J. June 15, 2012) (internal citations omitted); *see also id.* at *22 (agreeing with Plaintiff that "the level of ordinary skill in the art in September of 1990 would not require a PHOSITA to have specific experience in the development of aqueous nasal suspensions").

### B. Agreed-Upon Construction

As indicated in the parties' Joint Claim Construction Statement, D.I. 63, the parties have agreed upon and request that the Court adopt the following construction:

| Claim Term | Claim(s) | Joint Proposed Construction |
|---|---|---|
| "9α,21-dichloro-16α-methyl-1,4-pregnadiene-11β,17α-diol-3,20-dione-17-(2'-furoate)" | Claim 1 | mometasone furoate |

### C. Disputed Constructions

#### 1. "[Mometasone furoate] monohydrate" and "mometasone furoate monohydrate"

Teva does not dispute what "mometasone furoate monohydrate" means. In fact, Teva appears to agree that a person of ordinary skill in the art would understand "mometasone furoate

monohydrate" to be "mometasone furoate monohydrate." But Teva seeks to improperly limit the Asserted Claims so as to preclude mometasone furoate monohydrate that has been created in a certain way:

| Claim Term | Claim(s) | Merck's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "[mometasone furoate] monohydrate"; "mometasone furoate monohydrate" | Claims 1 and 6 | mometasone furoate monohydrate | mometasone furoate monohydrate that is not formed spontaneously from anhydrous mometasone furoate in aqueous suspension |

A mere glance at Teva's proposed construction reveals that Teva is not trying to actually define the disputed term. Teva does not argue that "mometasone furoate monohydrate" means anything other than "mometasone furoate monohydrate." Nevertheless, Teva seeks to limit the Asserted Claims so as to include mometasone furoate monohydrate "that is not formed spontaneously from anhydrous mometasone furoate in aqueous suspension." Not coincidentally, Merck has informed Teva that it believes anhydrous mometasone furoate in Teva's ANDA product, which is an aqueous suspension, is converting to the infringing monohydrate form. Thus, although all parties agree as to what constitutes "mometasone furoate monohydrate," Teva's construction conveniently—for Teva—seeks to exclude from the Asserted Claims mometasone furoate monohydrate that is forming in Teva's ANDA product. Teva's motive for advancing this construction is clear, but its support for having the Court adopt it is nonexistent.

The disputed term describes a chemical compound, not a process for making that compound. Indeed, the disputed term is coextensive with Claim 1, which quite simply covers the compound in its entirety, without further limitation:

1. [Mometasone furoate] monohydrate.

’353 Patent at Claim 1. Similarly, Claim 6 covers pharmaceutical compositions containing the same compound. ’353 Patent at Claim 6 (“A pharmaceutical composition comprising mometasone furoate monohydrate in a carrier consisting essentially of water.”). Neither claim implicates or requires a specific method of manufacturing the mometasone furoate monohydrate, and no such limitation should be imported. That is because “[t]he [asserted] claim is a claim for a compound. Its patentability thus derives from the ***structure*** of the claimed compound,” and the manner in which the compound may have been created is irrelevant. *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1421-22 (Fed. Cir. 1994) (emphasis in original).

In *Zenith Labs*, the Federal Circuit confirmed that composition claims cover the claimed compound in all instances, without further limitation. Similar to this case, the patent at issue in *Zenith Labs* covered a particular form of the claimed compound. *Id.* Zenith tried to avoid infringement by manufacturing its product with a different form of the claimed compound, but Bristol contended that the form used by Zenith converted to the infringing form by suggesting it “might form momentarily in a patient’s stomach.” *Id.* at 1421. In response, Zenith argued for a claim construction that would exclude such theories of infringement, requesting a construction that “the ’657 claim [be] limited to the pre-ingested, powdered form of Bouzard monohydrate.” *Id.* But the Federal Circuit recognized that “[t]he difficulty with Zenith’s argument, however, is in the nature of the sole claim in the patent. The claim as written and allowed simply describes a compound having specified chemical properties.” *Id.* Therefore, Bristol’s patent could not be limited to the “pre-ingested” form of the claimed compound. *Id.*

In examining another claim term covering a compound, the Federal Circuit summarized its analysis as follows:

> [C]laim 1 of the '723 patent reads: "Crystalline paroxetine hydrochloride hemihydrate." This language is not ambiguous but rather describes a very specific compound. The record repeatedly shows that artisans in this area of technology at the time of invention would have understood that the claim embraces PHC hemihydrate ***without further limitation***.
>
> * * *
>
> A description of characteristics [in the specification] does not redefine a compound with an established and unambiguous structural definition.
>
> * * *
>
> Thus, reading claim 1 in the context of the intrinsic evidence, the conclusion is inescapable that the claim encompasses, ***without limitation***, PHC hemihydrate—a crystal form of paroxetine hydrochloride that contains one molecule of bound water for every two molecules of paroxetine hydrochloride in the crystal structure.

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339 (Fed. Cir. 2005) (emphasis added); *see also Roche Palo Alto LLC v. Ranbaxy Labs. Ltd.*, No. 06-2003, 2009 WL 3261252, at *30-31 (D.N.J. Sept. 30, 2009) ("Claim 1 recites: 'The compound [valganciclovir HCl] in crystalline form.' . . . Such claims define the claimed subject matter solely in terms of its structure or other physical characteristics. Claim 1 is directed to a chemical compound per se and not a method of manufacturing such a compound.") (internal citations omitted).

Similarly, Judge Andrews has recognized that importing limitations regarding the manner in which components of a composition are formed "essentially converts the composition claim into a product-by-process claim. The Court therefore does not believe that [such a] construction is correct." *Merck Sharp & Dohme Corp. v. Xellia Pharm. APS*, No. 14-199, 2015 WL 82386, at *4 (D. Del., Jan. 6, 2015). Much like the dispute here, the dispute in *Xellia* concerned "whether the acetate buffer must be added separately, or can be formed in situ by adding ingredients that react and form the buffer within the composition." *Id.* And just as in *Xellia*, interpreting

"mometasone furoate monohydrate" to cover only mometasone furoate monohydrate "that is not formed spontaneously from anhydrous mometasone furoate in aqueous suspension"—*i.e.*, to cover only mometasone furoate that "must be added separately" and that cannot "be formed in situ by adding ingredients that react and form the [mometasone furoate monohydrate] within the composition"—would improperly import "process limitations [that] should not be read into a composition claim." *Id.*

Ignoring precedent, Teva seeks a construction that presumably would bolster its non-infringement defense on the theory that the mometasone furoate monohydrate in its ANDA product derives from anhydrous mometasone furoate in an aqueous suspension that converts to the monohydrate form in Teva's ANDA product. Incredibly, Teva's construction is so illogical that it defines "mometasone furoate monohydrate" in a way that excludes the manner in which the compound was first discovered:

> When ***aqueous pharmaceutical compositions, e.g. suspensions, containing anhydrous mometasone furoate*** were subjected to stability testing by rotating for four weeks at room temperature and 35° C., formation of a crystalline material which is different from the anhydrous mometasone furoate crystal was observed in suspension. Experiments were designed to determine the nature of the crystalline material.
>
> * * *
>
> The present invention provides mometasone furoate monohydrate.

'353 Patent at 1:18-31 (emphasis added). Thus, even though mometasone furoate monohydrate was ***discovered by its formation in certain aqueous suspensions containing anhydrous mometasone furoate***, Teva asks this Court to construe "mometasone furoate monohydrate" to be "mometasone furoate monohydrate ***that is not formed spontaneously from anhydrous mometasone furoate in aqueous suspension***."

Teva's construction is especially difficult to understand because, at some level, all mometasone furoate monohydrate will come from anhydrous mometasone furoate. Mometasone furoate is a synthetic compound, and as such, must be created in a laboratory environment. Merck discovered how to create mometasone furoate from other compounds, but the mometasone furoate thus formed is anhydrous mometasone furoate. *See* '353 Patent at 1:14-22. One way to create mometasone furoate monohydrate—which as its name suggests, differs from anhydrous mometasone furoate by the presence of water in its crystalline structure— is to dissolve anhydrous mometasone furoate and then form the monohydrate in the presence of water under certain conditions. When doing so, there are only two options: 1) dissolving the anhydrous mometasone furoate in solution, or 2) suspending it. The only real difference between the two is whether the mometasone furoate is dissolved completely (in the case of a solution) or not (in the case of a suspension). Teva provides no meaningful distinction as to why material formed from a solution should be covered by the claims, but material formed from a suspension should not.

Additionally, Teva's proposed construction introduces ambiguity into an otherwise clear claim. For one, it is not clear what "formed spontaneously" even means. As explained above, mometasone furoate is a synthetic compound, so it must be created in the first instance. From there, whether a crystalline form is created and which form that might be depends on a myriad of factors regarding the environment and storage conditions. It is unclear what would constitute forming "spontaneously" or not under Teva's definition.

Fortunately, the Federal Circuit has made clear that importing such limitations is inappropriate when the term to be construed is directed to a compound or composition. Conversion does not get much more spontaneous than a situation where the infringing form

allegedly "might form momentarily in a patient's stomach," but even in that instance, the Federal Circuit has said that such conversion would be covered by a composition claim generally directed to the claimed compound. *Zenith Labs*, 19 F.3d at 1421.

Teva's proposed construction also would introduce uncertainty in that it would be virtually impossible to determine whether or not a particular sample of mometasone furoate monohydrate was infringing. Once the mometasone furoate monohydrate in question was formed and isolated, there would be no way to determine whether that sample had been formed from a suspension of anhydrous mometasone furoate, a solution of mometasone furoate (which could be created with any form of mometasone furoate, not just anhydrous mometasone furoate), or some other manner—such as a recrystallization of mometasone furoate monohydrate from a suspension of mometasone furoate monohydrate. In other words, looking at the compound, a person of ordinary skill in the art would have no idea how the mometasone furoate monohydrate was formed, nor would they or should they care. What matters for the purposes of the claims is whether the compound is mometasone furoate monohydrate.

Because the claim language "mometasone furoate monohydrate" is plain on its face, and because the only dispute between the parties relates to Teva's inappropriate attempt to limit a claim term covering a compound to a particular method of making that compound, the Court should construe "mometasone furoate monohydrate" to be "mometasone furoate monohydrate."

**2. "Pharmaceutical composition comprising mometasone furoate monohydrate"**

Similar to the dispute with respect to "mometasone furoate monohydrate," the parties do not disagree as to the actual meaning of any of the terms appearing in the disputed phrase "pharmaceutical composition comprising mometasone furoate monohydrate." Indeed, the parties' proposed definitions for the words actually appearing in the disputed phrase are

identical. But once again, Teva has sought to inject limitations not present in or implicated by the plain meaning of the claim terms:

| Claim Term | Claim(s) | Merck's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "pharmaceutical composition comprising mometasone furoate monohydrate" | Claim 6 | composition suitable for treatment that contains mometasone furoate monohydrate | composition suitable for treatment that contains a therapeutically effective amount of mometasone furoate monohydrate |

Claim 6 does not require the claimed composition to include a particular amount of mometasone furoate monohydrate, but according to Teva's proposed construction, compositions would only infringe if they contain "a therapeutically effective amount" of mometasone furoate monohydrate. This cannot be the case.

As an initial matter, there is no support to read this claim as requiring that Merck has to prove a certain amount of mometasone furoate monohydrate is present in Teva's ANDA product. The claim language itself does not include such a limitation, nor can any portion of the disputed claim term justify importing such a limitation. Teva clearly is not suggesting that "mometasone furoate monohydrate" should be defined so as to require some specific amount of mometasone furoate monohydrate; if so, that same numerical limitation would be built into Teva's proposed construction for "mometasone furoate monohydrate," above. But since Teva's proposed construction is not so restricted, the only portion of the disputed term remaining is "pharmaceutical composition comprising."

Examining "pharmaceutical composition comprising" in the context of other claims of the '353 patent, however, demonstrates that it cannot be the source for any numerical limitation either. For example, Claim 2 contains nearly identical language to Claim 6, but Claim 2

affirmatively specifies an amount of mometasone furoate that must be present in the claimed composition:

| Claim 2 | Claim 6 |
|---|---|
| A pharmaceutical composition comprising ***an antiinflammatory amount of*** mometasone furoate monohydrate in a pharmaceutically acceptable carrier. | A pharmaceutical composition comprising mometasone furoate monohydrate in a carrier consisting essentially of water. |

Thus, essentially the same limitation that Teva is trying to import into Claim 6 is explicitly incorporated into the plain language of Claim 2. "Mometasone furoate is known to be useful in the treatment of inflammatory conditions." '353 Patent at 14-15. So when Teva seeks to limit Claim 6 to compositions having "a therapeutically effective amount of" mometasone furoate monohydrate, presumably that limitation is approximately equivalent to having a composition with "an antiiflammatory amount of" mometasone furoate monohydrate. The key difference, of course, is that Claim 2 actually limits the claimed compositions to those with "an antiinflammatory amount of mometasone furoate monohydrate," but Claim 6 does ***not*** include such a limitation.

Additionally, Teva cannot argue that such a limitation is somehow built into or inherent in the term "pharmaceutical composition." Both Claim 2 and Claim 6 include "pharmaceutical composition," and that term should be construed consistently throughout the claims. *Phillips*, 415 F.3d at 1314. Therefore, incorporating the "a therapeutically effective amount" language of Teva's proposed construction into "pharmaceutical composition" would render meaningless the "an antiiflammatory amount" limitation of Claim 2.

Similarly, Claim 7 depends from Claim 6 and further limits Claim 6 to compositions containing specific amounts mometasone furoate monohydrate. Therefore, to the extent the patentee desired to limit the claims to compositions containing particular amounts of

mometasone furoate monohydrate, they clearly understood how to do so. And because the only limitation added by dependent Claim 7 is that a particular amount of mometasone furoate monohydrate must be present in the composition of Claim 7, there is an especially strong presumption that Claim 6 does not contain a limitation on the amount of mometasone furoate that must be present in its claimed composition. *Liebel-Flarsheim*, 358 F.3d at 910; *SunRace Roots*, 336 F.3d at 1302-03.

Because the plain language of Claim 6 does not require or suggest that the claimed pharmaceutical compositions must include a certain amount of mometasone furoate monohydrate, and because other claims of the ’353 patent indicate that Claim 6 should not be so limited, the Court should construe “pharmaceutical composition comprising mometasone furoate monohydrate” as “composition suitable for treatment that contains mometasone furoate monohydrate.”

## VI. CONCLUSION

For the foregoing reasons, Merck respectfully requests that its proposed constructions be adopted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Nicolas Barzoukas
Joshua Davis
Lisa Thomas
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

April 23, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 23, 2015, upon the following in the manner indicated:

Richard L. Horwitz, Esquire *VIA ELECTRONIC MAIL*
David E. Moore, Esquire
Bindu A. Palapura, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
*Attorneys for Defendant Teva Pharmaceuticals USA, Inc.*

Frederick H. Rein, Esquire *VIA ELECTRONIC MAIL*
Michael B. Cottler, Esquire
Ira J. Levy, Esquire
Joshua A. Whitehill, Esquire
GOODWIN PROCTER LLP
The New Yeork Times Building
620 Eighth Avenue
New York, NY 10018
*Attorneys for Defendant Teva Pharmaceuticals USA, Inc.*

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)