```
 1              IN THE UNITED STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF DELAWARE

 3                          -  -  -

 4
     MERCK SHARP & DOHME CORP.,    :   CIVIL ACTION
 5
                    Plaintiff,     :
 6                                 :
         vs.                       :
 7                                 :
     TEVA PHARMACEUTICALS USA,     :
 8   INC.,                         :
                                   :
 9              Defendant.    :   NO. 14-874 (SLR)(SRF)
     ---------------------------   :
10   MERCK SHARP & DOHME CORP.,    :   CIVIL ACTION
                                   :
11                  Plaintiff,     :
                                   :
12       vs.                       :
                                   :
13   AMNEAL PHARMACEUTICALS LLC,   :
                                   :
14              Defendant.    :   NO. 15-250 (SLR)(SRF)

15
                             -  -  -
16
                        Wilmington, Delaware
17                      Friday, July 31, 2015
                        9:27 o'clock, a.m.
18
                             -  -  -
19
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
20
                             -  -  -
21

22

23
                        Valerie J. Gunning
24                      Official Court Reporter

25
```

```
 1    APPEARANCES:

 2
              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
 3            BY:  JACK B. BLUMENFELD, ESQ.

 4
                      -and-
 5

 6            BAKER BOTTS L.L.P.
              BY:  NICOLAS BARZOUKAS, ESQ.,
 7                 JOSHUA DAVIS, ESQ. and
                   JANET FAIR, ESQ.
 8                 (Houston, Texas)

 9
                   Counsel for Plaintiff
10                 Merck Sharp & Dohme Corp.

11

12            POTTER, ANDERSON & CORROON LLP
              BY:  BINDU A. PALAPURA, ESQ.
13

14                    -and-

15
              GOODWIN PROCTER LLP
16            BY:  FREDERICK H. REIN, ESQ.,
                   MICHAEL B. COTTLER, ESQ.,
17                 IRA J. LEVY, ESQ.,
                   JOSHUA A. WHITEHILL, ESQ.
18                 ANDREW E. RILEY, ESQ. and
                   AVIV ZALCENSTEIN, ESQ.
19                 (New York, New York)

20
                   Counsel for Defendant
21                 Teva Pharmaceuticals USA, Inc.

22

23            SMITH, KATZENSTEIN & JENKINS LLP
              BY:  NEAL C. BELGAM, ESQ.
24

25                    -and-
```

```
 1    APPEARANCES (Continued):

 2
                  BUDD LARNER, P.C.
 3                BY:  CONSTANCE S. HUTTNER, ESQ.

 4
                       Counsel for Defendant
 5                     Amneal Pharmaceuticals LLC

 6

 7                PHILIPS, GOLDMAN & SPENCE, P.A.
                  BY:  JOHN C. PHILLIPS, JR., ESQ. and
 8                     MEGAN C. HANEY, ESQ.

 9                          -and-

10

11                RAKOCZY, MOLINO, MAZZOCHI & SIWIK, LLP
                  BY:  JOSEPH T. JAROS, ESQ. and
12                     ROY CHAMCHARAS, ESQ.
                       (Chicago, Illinois)
13

14                     Counsel for Intervenor
                       Apotex Inc.
15

16                        -  -  -

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3                (Proceedings commenced in the courtroom,

 4     beginning at 9:27 a.m.)

 5

 6                THE COURT:  Let's start with introductions.

 7     Mr. Blumenfeld?

 8                MR. BLUMENFELD:  Good morning, your Honor.

 9                THE COURT:  Good morning.

10                MR. BLUMENFELD:  Jack Blumenfeld from Morris

11     Nichols for Merck.  At counsel table are Nick Barzoukas,

12     Josh Davis from Baker Botts, and Janet Fair, who is in-house

13     at Merck.  And in the back we have Dr. Jeremy Cockcroft for

14     the next hearing.

15                THE COURT:  Right.  Thank you very much, sir.

16                MR. BLUMENFELD:  Thank you.

17                THE COURT:  Good morning.

18                MS. PALAPURA:  Good morning, your Honor.  Bindu

19     Palapura from Potter Anderson on behalf of Teva.  With me

20     today from Goodwin Procter, Fred Rein.

21                MR. REIN:  Good morning, your Honor.

22                MS. PALAPURA:  Michael Cottler.

23                MR. COTTLER:  Good morning, your Honor.

24                THE COURT:  Good morning.

25                MS. PALAPURA:  Joshua Whitehill, Ira Levy.  And
```

```
 1    in the back there we have Andrew Riley and Aviv Zalcenstein.

 2    And with us from in-house at Teva is Joseph Crystal and

 3    David Fennick.

 4             THE COURT:  All right.  Welcome all.  Good

 5    morning.

 6             All right.  I think we only have two disputed

 7    claim limitations.  It shouldn't take terribly long.  So why

 8    don't we get started on that so we can get to the other

 9    issue.  And I will let plaintiff start its presentation.

10             MR. BARZOUKAS:  Good morning, your Honor.  Nick

11    Barzoukas on behalf of Merck Sharp & Dohme.

12             If I may approach to hand two hard copies of the

13    presentation?

14             THE COURT:  Yes.  Thank you very much.

15             (Mr. Barzoukas handed slides to the Court.)

16             MR. BARZOUKAS:  And, your Honor, as a logistics

17    matter, Teva's counsel and we have agreed, and if it pleases

18    the Court, to do it term by term on the two terms.  So I

19    will address the first term and Teva's counsel will address

20    the first term.  We will do the second term.  On our behalf,

21    Mr. Davis will address the second term.

22             THE COURT:  All right.  That's fine.

23             MR. BARZOUKAS:  Your Honor, as a matter of

24    background, this is an ANDA case, which I note of which I

25    know you're well aware of the type of case, and it's our
```

1    first chance to talk about it.  The product that is

2    actually at stake and being protected by the patent here is

3    Nasonex.

4              Nasonex is a nasal spray that's used for

5    allergic rhinitis.  It's a fancy word for the runny nose and

6    itchy nose that people get typically with allergies, and

7    that's the primary purpose of it.  It has been a very

8    successful product and it treats a condition that affects

9    many hundreds of millions of people across the world.

10             The product is actually what is called a

11   suspension of the active ingredient, suspension meaning that

12   the actual particles of the chemical, of the ingredient that

13   gives you the activity, the therapeutic activity, is in a

14   solid form.  It's not dissolved.  In other words, it's not

15   dissolved in the liquid.  It's just suspended in little

16   bitty small particles.  You can't see them with the naked

17   eye, but they're there.  And the compound that is in it is a

18   compound that was originally discovered by Merck scientists

19   and over time developed for use in this nasal spray.

20             The one patent we have at issue is the '353

21   patent and it's issued to the Merck inventors that worked to

22   develop the particular new form that is present in the nasal

23   spray.  With respect to the claim construction, what is

24   important here is what is really the invention reflected in

25   this patent, and I think if we look at both the title and

1    the abstract of the invention, it tells us what the

2    inventions are, and in effect, there are three of them.

3              First of all, it relates to a new and novel

4    compound, a new composition of matter that had never existed

5    before, and that is the mometasone furoate monohydrate.  At

6    least at this point nobody has ever shown that was another

7    form of mometasone furoate monohydrate that was known until

8    these inventors discovered it.

9              Secondarily, they also developed new methods --

10   well, actually, they weren't methods before, but preferred

11   methods for making this new compound.  So they're saying

12   we also are advancing the invention for methods of making

13   it.

14             And, lastly, the third invention here is a

15   pharmaceutical compositions that contain it.

16             In this case two claims have terms that are

17   disputed among the parties.  With respect to the disputed

18   terms, it's claim 1 and claim 6.  Claim 1 relates actually

19   to the mometasone furoate monohydrate.  I won't try to twist

20   my tongue or our court reporter with trying to say the

21   actual chemical name.  And then claim 6 is actually a

22   composition that contains the mometasone furoate

23   monohydrate.

24             We don't have to worry about the long chemical

25   name because though originally Teva submitted it as a

1    disputed term, we have come to an agreement and both sides

2    agreed that the long chemical name simply means mometasone

3    furoate.  So from now on we'll just talk about it as

4    mometasone furoate.

5            This, your Honor, shows you the two terms we

6    have in dispute.  We have "mometasone furoate monohydrate,"

7    which appears in both claim 1 and 6, and then the second

8    term is pharmaceutical composition comprising "mometasone

9    furoate monohydrate," which appears only in claim 6.

10           The important thing to notice here as we see the

11   Merck proposed construction and the Teva proposed

12   construction is Teva is adding substantial limitations,

13   and we'll address this, why that's not appropriate to do

14   that when the claim straightforwardly sets forth its

15   parameters.

16           The person of ordinary skill in this area was

17   defined in a prior case, and this is the definition of a

18   person of ordinary skill.  The reason that's important is,

19   this is a definition that both parties have accepted in this

20   case from the previous case, and it's important in the claim

21   construction dispute because in the prior case, when the

22   Court in recognizing Dr. Trout, who is one of the experts

23   that submitted a declaration for the claim construction, and

24   he's a chemist expert in the crystal forms of

25   pharmaceuticals.  The Court specifically found that Dr.

1    Trout was one of ordinary skill, an expert in this area,

2    because the '353 patent focuses on a specific composition of

3    matter, mometasone furoate monohydrate.

4         So this is always to keep in mind that the

5    invention reflected in the patent is not simply

6    compositions, pharmaceutical compositions, but for the first

7    time ever the inventors here discovered a new compound, a

8    new form of matter that never had existed before.

9         Simply put, we start with the original

10   principles in claim construction, which is we have to look

11   at the claims, and adding a limitation to a claim that's not

12   there and in the language that the inventors choose in order

13   to encompass what their discovery is should not be

14   undertaken lightly.

15        So moving specifically to claim 1, which, of

16   course, in our case with the agreed upon term for the

17   chemical name becomes mometasone furoate monohydrate.  What

18   becomes clear upon looking at this is that the parties don't

19   really have a dispute as to what mometasone furoate

20   monohydrate is or means.  Both parties agree it's a certain

21   chemical and it has particular characteristics, and we'll

22   talk in a minute about them.  But it's a very specific

23   chemical.  The only dispute appears to be that Teva wants to

24   add this language that does not appear in the claim, and

25   that is not formed spontaneously from anhydrous mometasone

1   furoate in aqueous suspension.  So, in other words, they're

2   trying to limit a specific compound based on the way it's

3   formed even though that language does not appear anywhere in

4   the claim.

5         The thing that is interesting is, having

6   received our final infringement contentions, that's, of

7   course, the way we contend they infringe, so by adding this

8   language, what they are trying to achieve at least to get an

9   argument that even upon showing what our contention is, they

10  want to be able to argue that they still don't infringe.

11  And, you know, I will explain later why I don't think that's

12  necessarily true, but that is the argument they want.

13        The term is pretty simple, and when we look at

14  the specification of the '353 patent, it defines this

15  particular chemical, mometasone furoate monohydrate, and it

16  does so by giving its formula.  In column 1, for example,

17  the way the patent defines the compound itself is by giving

18  its formula.  And then going further down the specification

19  from column, from the end of column 1 to the middle of

20  column 3, the way the chemical, the mometasone furoate

21  monohydrate is described is always in terms of its physical

22  characteristics in the way that anybody that understands the

23  chemistry would define a new compound.

24        Now, Teva has raised the spectre of adding this

25  limitation under the guise of prosecution history estoppel,

1    and I think that's a red herring.  The way I want to look at

2    this is to look at language from the notice of allowance

3    from the Patent Office back to the inventors.  And here, the

4    Examiner from the Patent Office is telling the inventors why

5    the Examiner allowed this particular, the particular claims

6    of the patent to issue.  And in doing so, it's saying that

7    the way the inventors overcame the prior art rejections

8    under 102(a) -- under 102(b) and 103(a) for anticipation and

9    obviousness was by showing that the prior art compound that

10    had been raised against mometasone furoate monohydrate was

11    not the same as this compound.  In other words, the Patent

12    Office specifically is telling us, the reason we allowed

13    this is because this is a brand-new compound, you overcame

14    our objections claiming that this was perhaps a compound

15    that existed before, and they did so by specifically saying

16    you have characterized it with a different IR spectrum.  IR

17    spectrum is an analytical technique and it means infrared

18    spectrum.

19            Now, one of the things that is interesting is

20    that the infrared spectrum of mometasone furoate that would

21    be -- any mometasone furoate, whether it's prepared by a

22    method that is not the one that Teva is attempting to

23    exclude because of added language or whether it's made

24    through that method, it's not going to be different.  It's

25    indistinguishable.  And, furthermore, the application of the

1    file wrapper estoppel cannot be based on statements that

2    simply distinguish a chemical form based on its

3    characteristics.  The application of file wrapper estoppel

4    has to be a clear and unmistakable surrender of scope, and

5    as your Honor knows, this always happens typically in the

6    context where one has a rejection and they are trying to

7    carve out prior art to make sure that their claim does not

8    cover prior art and results in the Patent Office accepting

9    that distinction.

10            Now, this is from a seminal paper that first

11   looked at the structures between the prior art form, which

12   was mometasone furoate anhydrate and the new discovery of

13   the mometasone furoate monohydrate.  And what I wanted to

14   show you here was, these are different chemical compounds.

15   For example, you can see on the bottom, there is an

16   additional water molecule that comes into play which is

17   connected to the mometasone furoate through a hydrogen bond.

18   And, in fact, your Honor, if we superimpose the two, you

19   can see that particular other portions of the molecule

20   move around.  There's a physical difference between the

21   two.  So we're talking about an entirely new form of matter

22   here.

23            Now, the reason that's important is there is

24   substantial Federal Circuit law on how one is to look at

25   claims that claim a specific new form of matter.  And this

1    is a long quote, I'm not going to bother reading it, but

2    it's from SmithKline Beacham versus Apotex.  And the lesson

3    from this case was simply that when a new compound is

4    discovered and is set out based on its physical

5    characteristics, you don't simply -- it simply means that

6    compound under any circumstance.  You don't add claim

7    limitations to that compound, for example, by claiming,

8    trying to limit as to how it was made.

9                There is an interesting case where generics have

10   tried to assess limitations.  There's the Zenith Labs v.

11   Bristol Myers case, your Honor, where the argument by the

12   patentee there was that the actual infringing form of the

13   new compound, even though it wasn't in the, in the drug as

14   was given to the patient or as made by the generic, it

15   converted momentarily to that form in the stomach of the

16   patient.

17               So the generic in that case tried to add a

18   limitation to the compound claim to say that it had to be so

19   in its pre-ingested form.  The federal problem set out very

20   clearly in that case that since the compound, the new

21   compound was set out by its properties in the patent, you

22   couldn't limit the way in which it was formed.  It was

23   simply meant the existence, the presence of that compound.

24               Another aspect of Teva's argument, your Honor,

25   and I believe that's a red herring, is to try to throw

1    confusion by saying we have to limit the claim based on the

2    problem that the inventors were trying to solve.  The

3    problem with that premise is that the inventors here

4    discovered a new compound that never existed before.  They

5    really didn't set out to solve a pre-existing problem,

6    because nobody knew there was a pre-existing problem.  What

7    they did is they put together particular nasal formulations

8    and tried to make this as a viable drug for nasal delivery,

9    and in so doing they noticed that in some of them, they were

10   getting a formation of this new form, this new crystal form

11   that had never existed before.  So in the discovery of this

12   new form, they weren't trying to solve the problem.  They

13   just were trying to develop a new product and in doing so,

14   serendipitously perhaps, but they discovered a new form.

15           And it's important to note here that both in the

16   prior case that was tried, in the opinion, it is recognized

17   that this conversion didn't happen in every formulation that

18   they tried, so it only happened in some of them.  And

19   Professor Trout in his declaration he submitted, in

20   paragraph 27 sets out that it's fully expected that there

21   exist formulations in which the anhydrate form, that's the

22   prior art, would be more stable, and there are other

23   formulations in which the monohydrate, the form claimed by

24   the '353 patent, would be more stable.

25           I'm going to briefly touch on some of the things

1    Professor Trout said.  He is a professor at MIT, your Honor.

2    He's an expert in crystal forms formation and behavior,

3    particularly in pharmaceuticals.  And when he looked at

4    this, he sees the discovery of a new compound.  That is not

5    a solution to some particular problem.  They were -- they

6    stumbled upon the creation of this new compound, and any

7    time you get a new form of a compound in pharmaceuticals,

8    that opens a whole new avenue of things you may do, and in

9    that way it's in no way limited.

10            The compound, moreover, as a new form of matter,

11   it's described and circumscribed by its properties.  They

12   define what the compound is, not the way in which the

13   compound was formed.  And that is important because now

14   going into the next slide, it says, a person having ordinary

15   skill in the art would understand that any number of

16   analytical techniques could be used to determine whether a

17   particular crystalline substance was mometasone furoate

18   monohydrate.  None of those techniques would tell you

19   anything about how that specific sample of mometasone

20   furoate monohydrate was or was not synthesized.  In other

21   words, to somebody of skill in this area, once you get this

22   compound, you can determine whether it's the anhydrate form

23   or whether it's the monohydrate form, but you can't

24   determine how it was made.  And the way you identify it

25   through analytical techniques is by looking at those

1        physical characteristics that are described in the

2        patent.  So adding the limitation which one of skill in the

3        art can't determine by looking at the product itself does

4        not make any sense, your Honor.

5                And, again, and in reinforcing that point, it

6        says, no matter how mometasone furoate monohydrate is

7        formed, it is no less mometasone furoate monohydrate

8        than mometasone furoate monohydrate formed by any other

9        process.

10               The next point I want to raise, your Honor, is

11       adding the language that Teva is trying to add will actually

12       bring problems down the road because, for example, if you

13       recall, they want to add that it has to be mometasone

14       furoate monohydrate, that it's not what they call

15       spontaneously formed.

16               This is during Dr. Trout's deposition for his

17       declaration that he did in connection with this claim

18       construction.  They asked him specifically about his

19       understanding of mometasone furoate monohydrate.  And he

20       specifically said he -- he says at the end of this quote

21       from his answer, "and so mometasone furoate monohydrate is a

22       form of matter.  As such, it's independent of the way in

23       which it's formed.  Whether it's spontaneous, whatever

24       spontaneously means, which is very unclear, it doesn't

25       really make much sense either."  And that's because to

1    somebody of ordinary skill, in the chemical sense, the term

2    spontaneous doesn't have a meaning.  So we'll be adding a

3    term that we'll later try to define what does it really

4    mean, and the people in the area don't have a specific

5    meaning for it.

6           Now, Teva has come back and they have pointed,

7    for example, in the brief from the prior case when we were

8    describing the invention process by the inventors of the

9    '353 patent, we said that the formation discovery by the

10   inventors was spontaneous.  And the point I want to make

11   about that is, we as lay people saying the invention was

12   spontaneous, the vernacular using spontaneous means they

13   hadn't planned it, it wasn't expected.  It happened without

14   expectation.  They did not know it existed, so it happened

15   without their planning.  That does not mean that the term

16   spontaneous has a meaning to one of skill in the art if we

17   add it as a limitation to the claim.

18          Finally, your Honor, they make the point that we

19   should add this language with respect to how the mometasone

20   furoate monohydrate has to be formed because they say there

21   is a doctrine for construing claims as to preserve their

22   validity.  There are two problems with that, and I don't

23   think that this argument needs to be of concern, and that's,

24   the two points on that.

25          Number one, there's really no ambiguity on a

1        claim that claims mometasone furoate monohydrate.  As we

2        said before, it's a particular form of matter that is very

3        clearly identified as to how one figures out what it is.  As

4        such, there's really no ambiguity in that term.  So the

5        doctrine does not apply.

6                 But beyond that, in the prior case which went

7        all the way up to the Federal Circuit, Teva says here that,

8        and tries to claim to this Court that the Federal Circuit's

9        Rule 36 affirmance simply affirmed the Court's judgment of

10       noninfringement without addressing Apotex's arguments of

11       invalidity.  Well, the problem with that is that the

12       District Court in the prior case had upheld the validity of

13       the '353 patent, and that's even in the face of the same

14       arguments about 101, about subject matter patentability.

15       And those arguments were raised on the appeal because Apotex

16       had actually cross-appealed to say that the Court finding

17       the patent to not be invalid was wrong.  And just as Teva is

18       here claiming that the Court's Rule 36 affirmance has some

19       meaning, it certainly has some meaning on the fact that the

20       Federal Circuit did look at the arguments with respect to

21       the 101 claim that Apotex was making and upheld the District

22       Court's upholding of the patent's validity.

23                And, your Honor, this concludes the part that we

24       have for the first claim term.  I will be happy to answer

25       any questions or come up later, but I will yield to Mr.

1    Rein.

2              THE COURT:  All right.  Thank you very much.

3              MR. REIN:  Might I approach the bench to hand

4    you two copies of our slides?

5              THE COURT:  Yes.  Thank you.

6              MR. REIN:  Thank you.

7              (Mr. Rein handed slides to the Court.)

8              MR. REIN:  Good morning, your Honor.  And may

9    it please the Court, I will be arguing on behalf of Teva

10   this morning with respect to today's claim construction

11   disputes.

12             Merck has asserted, as you've heard, claims 1, 6

13   and 9 through 12 against Teva.  The first claim term I will

14   address, mometasone furoate monohydrate, appears in claims 1

15   and 6, and because claims 9 through 12 depend from claim 6,

16   this construction bears on all the asserted claims.

17             The second term, pharmaceutical composition

18   comprising mometasone furoate monohydrate, appears in

19   claim 6 and therefore bears only on claim 6 and 9 through

20   12.  I will address that term after Mr. Davis speaks later

21   today.

22             I'd like to take a few moments to add some

23   background that will help to frame our discussion here

24   today.  We'll be talking about, as you've heard, two

25   crystalline forms of mometasone furoate, anhydrous

1    mometasone furoate, which I will call MFA, and mometasone

2    furoate monohydrate, which I will call MFM.

3                    Teva's ANDA product is an aqueous suspension

4    made using MFA and not MFM.  Merck agrees.  Merck's position

5    is that Teva infringes the asserted claims because over the

6    shelf life of the product, the MFA in aqueous suspension

7    purportedly converts to MFM.  And this isn't the first time

8    that Merck has made such an allegation.  As your Honor will

9    recall and as counsel for Merck mentioned, Merck previously

10   sued Apotex in the District of New Jersey over the same

11   patent.  Apotex's ANDA product was also prepared with MFA

12   and Merck alleged that the MFA in Apotex's product

13   spontaneously converted to MFM.  The Court found, however,

14   that Merck failed to demonstrate the presence of any MFM in

15   Apotex's ANDA product.  Merck will similarly fail in this

16   case.

17                    The Court need not decide this today or in the

18   next few weeks.  As the Court will recall, in the

19   September 17th, 2014 scheduling conference, Teva explained

20   that if the Court were to accept Teva's construction of the

21   claim term mometasone furoate monohydrate, Teva would not

22   infringe.  This is because Teva's construction excludes

23   spontaneously forming MFM from the scope of the asserted

24   claims.  Thus, if Merck alleges that MFM spontaneously forms

25   in Teva's product just as Merck so alleged with respect to

1     Apotex's product, then under Teva's construction of

2     mometasone furoate monohydrate, Teva would not infringe any

3     of the asserted claims.

4          Moreover, Teva's construction of the claim term

5     pharmaceutical composition comprising mometasone furoate

6     monohydrate requires the presence of a therapeutically

7     effective amount of MFM.  Therefore, even if there was some

8     trace amount of MFM in Teva's product, such an amount of MFM

9     would not confer therapeutic efficacy by itself.  Under

10    Teva's construction of the term pharmaceutical composition

11    comprising mometasone furoate monohydrate, Teva could not

12    infringe claim 6 and 9 through 12.  Therefore, if the Court

13    were to rule in Teva's favor on one or both of these claim

14    terms, Teva would respectfully seek leave to file summary

15    judgment papers soon after the claim construction decision.

16    And with this background in mind, I would like to now turn

17    to the construction of the first claim term, mometasone

18    furoate monohydrate.

19          The parties have agreed, as you've heard, that

20    the chemical nomenclature in asserted claim 1 may be

21    referred to as mometasone furoate monohydrate.  However, the

22    parties disagree what may be encompassed by this term.

23    Teva's construction, which excludes MFM that spontaneously

24    forms from MFA in aqueous suspension is supported by the

25    specification and the file histories of the '353 patent and

related applications.  When these sources of intrinsic

evidence are considered together, especially in view of

admissions made by Merck in the prior Apotex litigation and

to the FDA, a clear picture emerges of a particular problem

that was solved by the inventors with the '353 patent.

That problem was undesirable crystal growth of

MFM in aqueous suspensions of MFA.  Crystal growth is

undesirable because it changed the particle size of the

active pharmaceutical ingredient or API, making the API

unsuitable for pharmaceutical compositions.

The solution was to synthesize MFM in a

controlled manner and make aqueous suspensions that

incorporated MFM at the outset.  That way, there was no

spontaneous formation of MFM crystals from MFA in aqueous

suspension.

As you can see on this slide, Teva's

construction recognizes this problem and solution and

appropriately narrows the construction of the term

mometasone furoate monohydrate to exclude the problem of

spontaneously formed MFM that the inventors sought to avoid.

In contrast, Merck's construction would seek to encompass

even the problem to be solved, which is improper under the

law.

I'd like to now briefly lay out some of the

relevant law that supports Teva's construction.  Claim terms

 1    should be construed in view of the problem the inventors

 2    were attempting to solve as well as the inventor's solution.

 3    It makes little sense to construe a claim to cover the very

 4    subject matter that the inventors try to avoid.

 5              In CVI/beta Ventures v. Tura, discussed in

 6    Teva's responsive brief at pages 7, 8 and 10, the Federal

 7    Circuit stated that, quote, "In construing claims, the

 8    problem the inventor was attempting to solve as discerned

 9    from the specification and prosecution history is a relevant

10    consideration."

11              Genentech v. Sandoz, a 2012 case, discussed in

12    Teva's responsive brief at pages 10 and 11 is instructive on

13    this point.  Genentech concerned a meaning of a particular

14    drug Valganciclovir, quote, "in crystalline form," end

15    quote.  The broad construction advocated by plaintiffs in

16    Genentech would have ensnared the amorphous form of the drug

17    that converted to crystalline form in an oral dosage

18    formulation, much as Merck's broad construction would

19    ensnare MFA that purportedly converts to MFM in aqueous

20    suspension.

21              In considering this issue, the Northern District

22    of California citing CVI/beta relied on the specification to

23    inform its construction.  The specification made clear that

24    the invention sought to, quote, "solve the pre-existing

25    problem of the drug in a non-stable oral formulation."  The

1    District Court therefore concluded that, quote, "The

2    specification is clear that the invention was intended to

3    claim a stable form of Valganciclovir hydrochloride at its

4    inception in order to provide the stable oral dosage of the

5    drug."

6         Bearing this in mind, we look first at the

7    intrinsic evidence.  The problem the inventors sought to

8    solve in the '353 patent is straightforward.  Column 1 at

9    lines 18 through 29 in the background of the invention lays

10   out both the problem and the solution.  In this slide we

11   have grayed out the solution so we can first focus on the

12   problem.

13        This excerpt sets forth the issue confronting

14   the inventors.  Namely, formation of crystalline material,

15   right over here, or crystal growth in aqueous suspensions

16   of MFA, and Merck admitted in the Apotex case that

17   the aforementioned crystalline material was MFM, which was

18   formed upon spontaneous conversion from MFA in aqueous

19   suspension.

20        Here, you can see an excerpt from Merck's

21   opposition to summary judgment of noninfringement as

22   cited in the pretrial, the proposed pretrial order in the

23   Apotex litigation.  In its opposition, Merck stated that

24   the background of the invention section of the '353 patent

25   explains that when the inventors were working with aqueous

suspensions of MFA, they noticed that, quote, "spontaneous

conversion," end quote, of MFA to MFM.  This conversion

of MFA to MFM was problematic because it meant that the

aqueous suspension made with MFA was unstable due to crystal

growth.

Faced with this problem of instabililty, in

particular the spontaneous conversion of MFA to MFM, the

inventors arrived at a solution relating to a more stable

product.  That solution is presented right after the problem

in column 1, lines 23 through 29.

The inventors discovered that aqueous

suspensions of MFM did not exhibit the crystal growth

detected in aqueous suspensions of MFA.  Accordingly, the

solution was to make aqueous suspensions that started with

the stable crystalline form, which the patent indicates is

MFM, in order to eliminate the problematic crystal growth

encountered with suspensions of MFA.  And, indeed, according

to the patent, the solution worked.  The aqueous suspensions

that started with MFM were stable and did not exhibit the

crystal growth of MFM detected in aqueous suspensions of

MFA.

Now, on this slide we summarized four places

where the patent uses language consistent with the solution

to the problem.  First, the summary of the invention at

column 1 states that the invention also provides for stable

aqueous compositions of MFM.

Second, column 3 notes that the pharmaceutical compositions, according to the invention, can be prepared by combining MFM with an inert pharmaceutical carrier.  That is by using MFM at the outset.

Third, all the pharmaceutical composition examples of the patent describe aqueous suspensions where MFM was added at the outset.

And, fourth, column 6 at the end of Example 5 notes that the suspensions that started with MFM did not exhibit the crystal growth that was detected in those aqueous suspensions of MFA, thus showing that the solution worked.

The aqueous suspensions that used MFM at the outset avoided the crystal growth of MFM detected in aqueous solution suspensions of MFA.  Furthermore, this is not just Teva's interpretation of the specification.

The crystal growth problem was recognized during the examination of the PCT application underlying the '353 patent.  In an international preliminary examination report, the PCT Examiner clearly understood that the inventor's solution was directed to compositions containing MFM that were stable and did not exhibit crystal growth.

The specification of the patent is not the only relevant intrinsic evidence.  The prosecution histories also

1    are relevant consideration for determining the problem to be

2    solved.  In the prosecution history of the '353 patent and

3    related applications, Merck characterized its invention as

4    being a solution to the crystal growth problem detected in

5    aqueous suspensions of MFA.

6              For example, in the prosecution of the '353

7    patent, Merck characterized MFM as providing more stable

8    aqueous suspensions than formulations containing MFA.  A

9    person of ordinary skill in the art would understand that

10   the improved stability of the MFM composition is due to the

11   elimination of crystal growth of MFM present in aqueous

12   suspensions of MFA as referenced in the '353 patent.

13             Merck also made similar remarks stressing the

14   superiority of aqueous suspensions made with MFM during the

15   prosecution of the related '239 application, a parent

16   application of the '353 patent.

17             Similarly, Merck also stressed the superiority

18   of aqueous suspensions made with MFM during the prosecution

19   of the related '781 patent, a continuation of the '353

20   patent.  Thus, an examination of the various related file

21   histories shows that Merck repeatedly and consistently

22   characterized the superior stability of aqueous suspensions

23   that contain MFM at the outset when compared to those

24   that start with MFA.  And the Federal Circuit held in

25   Sunovion v. Teva, discussed in Teva's responsive brief at

1  page 12, when a patentee repeatedly and consistently

2  characterizes the invention of the patent, a narrower

3  claim construction than could have been given in the

4  abstract may be appropriate.

5           In addition to the intrinsic record discussed

6  above, Merck also made admissions in the Apotex litigation

7  and to the FDA in which it characterized the problem to be

8  solved as one of undesirable crystal growth in MFA

9  suspensions, and the solution as being the formulation of

10  suspensions containing MFM at the outset.

11           In a citizen's petition, Merck described

12  particle size growth due to crystal growth of MFM as a

13  problem associated with aqueous suspension of MFA that was

14  so severe that those suspensions were deemed unsuitable for

15  further development.  In the same petition, Merck also

16  described how this crystal growth problem was solved by

17  preparing solutions that used MFM at the outset.

18           In the Apotex case, Merck admitted that this

19  particle size growth, this particle size growth was an

20  undesirable effect and was a problem that the inventors

21  formulated around by starting with MFM at the outset.

22  Thus, in the Apotex litigation and to the FDA, Merck

23  repeatedly characterized aqueous suspensions made with MFM

24  as exhibiting superior stability to suspensions made with

25  MFA.

1          Merck defined its invention as overcoming a

2     problem.   Namely, the problem of spontaneously forming MFM.

3     Put another way, the problem was overcome -- the problem

4     that was overcome was the instabililty of aqueous

5     suspensions of MFA that exhibited conversion to MFM, which

6     caused undesirable crystal growth.   Preparing aqueous

7     suspensions of MFM avoided this instabililty problem.

8          To recap, we first saw the problem described in

9     the specification and the solution described in the

10    specification and in the examples.   We then saw the

11    characterizations that Merck made during the prosection of

12    the '353 patent and related applications consistently

13    describing the greater stability of aqueous suspensions made

14    with MFM instead of with MFA.

15          And, finally, we saw admissions made by Merck

16    in the previous litigation against Apotex and in its

17    citizen's petition that were consistent with the problem

18    and solution identified in the intrinsic evidence.   In such

19    a situation, a narrowing construction is appropriate.   And

20    so what Teva is proposing consistent with the case law we

21    discussed is a construction that recognizes this purpose of

22    the invention.   That is, making a stable aqueous suspension

23    with MFM at the outset that avoids the crystal growth

24    problem that arose from the conversion of MFA to MFM in the

25    aqueous suspension.

1           And this is the difference between Merck's and

2     Teva's constructions.  Merck's construction could make sense

3     in the abstract without reading the specification and the

4     file histories, but that is not how claim terms are

5     construed.  Instead, in view of the specification and the

6     various file histories, and consistent with the admissions

7     made in the Apotex case and the citizen petition, the only

8     construction that makes sense is the one that does not

9     encompass the problem to be solved, that is crystal growth

10    associated with spontaneously forming MFM.  For these

11    reasons, we respectfully ask the Court to adopt Teva's

12    construction of mometasone furoate monohydrate, a

13    construction that excludes MFM that is formed spontaneously

14    from MFA in aqueous suspension.

15          THE COURT:  I have to say the public notice

16    function is a complicated one when you've got a chemical

17    compound that's clearly set forth with nothing else that you

18    are asking the public to go back to all of these different

19    sources and reach the conclusion that you've reached for

20    your proposed construction.  That's certainly not the way I

21    usually do claim construction.  I take it you think you have

22    a compelling case for adding this limitation.

23          MR. REIN:  Your Honor, I would say one of the

24    cases that might help convince you is the Nystrom v. Trex

25    case that we cited in our responsive brief.  That dealt with

the term board.  It says, I know what a board is.  I go to a

lumber yard and a pick up a board or a board that you can

pick up.  But the Federal Circuit there considering the

specification, and this was after Phillips, it changed its

construction from what it thought was the plain meaning to

one that was based on the specification, and after Phillips,

the Federal Circuit construed board as being a material that

is cut from a log.

And if you wait, I can --

THE COURT:  I certainly am going to look at the

case law, but it seems to me as though a chemical compound

is yet a different animal than a board.

MR. REIN:  Yes.  Let me just make two more

points.

THE COURT:  Sure.

MR. REIN:  It is a board was construed to mean,

quote, "wood decking material cut from a log," end quote.

That's from Nystrom 423 F.3d at 1144.

I would say while we certainly understand where

your Honor is coming from, the cases that Merck cited, the

SmithKline Beacham case and the Zenith case where the Court

looked at the chemical term broadly, did not face -- in

those cases the Federal Circuit was not faced with

consideration of the problem to be solved that was made

abundantly clear over here.

```
 1                     And my last point would be, we believe that the

 2       2012 Northern District of California case, Genentech v.

 3       Sandoz, is an appropriate case to consider because there

 4       are -- the District Court, in construing Valganciclovir

 5       hydrochloride in crystalline form limited it to exclude the

 6       conversion from the amorphous form to the crystalline form.

 7       That's what we're basically asking your Honor to do here

 8       consistent with both the specification and the prosecution

 9       history.

10                     THE COURT:  All right.  Thank you very much.

11                     MR. REIN:  Thank you.

12                     MR. BARZOUKAS:  Your Honor, if I may address a

13       couple of issues that Mr. Rein raised.

14                     THE COURT:  Sure.

15                     MR. BARZOUKAS:  It will only take a couple of

16       minutes.

17                     I will start off where he left off with respect

18       to the Genentech v. Sandoz case and Valganciclovir, and it's

19       a very short case.  I think it's only seven pages, your

20       Honor.

21                     First of all, that case did not involve the

22       discovery of a specific form of matter.  It simply claimed

23       in the abstract the compound in crystalline form.  And a

24       reading of the case actually shows that it was file history,

25       a typical example of prosecution his estoppel where the
```

1     Patent Office cited to the patentee specific prior art in

2     which crystalline Valganciclovir was formed after the

3     product had been formulated.  In other words, there were

4     crystalline forms in the prior art that were formed after

5     the product had been formulated and they were known, and

6     actually that's also set out in the specification of that

7     patent.

8              And the patentee in that case sought to carve

9     out those pre-existing prior art forms, and that's what

10    limited the scope of that claim.  In other words, it's a

11    prototypical file history estoppel situation where the

12    patentee was seeking to carve out the prior art.

13             We don't have anything like that in our case,

14    your Honor, where again there is no -- the only prior art

15    that was cited here was the prior existence of the

16    mometasone furoate anhydrate, and as the notice of

17    allowability that shows us how the Patent Office was

18    convinced to grant the patent was by being convinced that

19    this was indeed a form that had never existed before.  It

20    was a brand-new form.  So that case is inapposite.

21             And, again, what Teva does in trying to bring up

22    the issue of the problem faced, they forget the fact that

23    this patent contains three different, three separate

24    inventions:  The actual compound itself in new form of

25    matter and, you know, methods for actually making it and

1      pharmaceutical compositions containing it.

2                    And just as an example, and I'm not going to try

3      to put Mr. Rein's slides up, but he mentioned, for example,

4      in slide 7, he gave a collection of statements made to the

5      Patent Office and he titled it inventor solution.  And if

6      you actually read even the excerpts he provide presented, I

7      will read the first one.  The present invention also

8      provides aqueous stable pharmaceutical compositions of

9      MFM.

10                   The next one:  The pharmaceutical compositions

11     according to the invention can be prepared by combining MFM

12     with any suitable inert pharmaceutical carrier.

13                   The fourth point he has, examples describe

14     aqueous suspensions.

15                   The fourth bullet point:  No crystal growth was

16     detected in those aqueous suspensions.

17                   And, again, at best, that's relating to actual

18     pharmaceutical suspensions compositions.  It's not relating

19     to the discovery of a new compound that had never existed

20     before.

21                   The same thing goes to some of the statements he

22     presented on slide --

23                   THE COURT:  When you say it hadn't existed

24     before, I mean, it's my understanding it existed before.  It

25     just hadn't been identified or characterized?

1           MR. BARZOUKAS:  Your Honor, as far as we know,

2  it had never actually existed before until the inventors of

3  the '353 patent conducted the experiments that are reflected

4  in the patent.

5           THE COURT:  So there was no spontaneous

6  conversion of MFA to MFM until the inventors did it?

7           MR. BARZOUKAS:  There is absolutely no evidence

8  that we are aware, and we've gone through one full round of

9  the case where one generic, Apotex in that case, was trying

10  to invalidate the patent.  Nobody has brought up, you know,

11  an instance that shows that this compound existed before

12  these inventors put together these particular formulations

13  in these conditions.  As I said, to us, the term

14  spontaneously makes sense in the discovery in that nobody

15  even knew something else was going to form at that time.

16  In other words, it was unexpected because nobody could know

17  it.

18           But, your Honor, I want to be very clear on

19  this.  There's absolutely no instance that is known that

20  this compound existed before.  It's not just the fact that

21  this was characterized for the first time, but they made it

22  for the first time in conducting their experiments.

23           The next point I wanted to make with respect to

24  I think that Teva adds to the confusion with respect to the

25  problem solution that they raise is on their slide 14, your

1      Honor, whether taking some excerpts from, I think it's the

2      post-trial briefing in the prior case.  And there, and I'm

3      going to read from what they have a finding of --

4               THE COURT:  You don't have to read it.

5               MR. BARZOUKAS:  Okay.

6               THE COURT:  I've got it.

7               MR. BARZOUKAS:  If you see, they highlighted the

8      end of fact 89, where it says exhibit particle growth was

9      not a desirable effect.  But they forget to highlight the

10     first part.  Over time, Dr. Yuen and Ms. Ettinger noticed

11     that some of the formulations started to exhibit particle

12     size.  In other words, and as I set out when I spoke at the

13     beginning was that certain formulations they did, and that

14     was a finding both of the Court in the Apotex case, and Dr.

15     Trout sets out clearly, some of the formulations did not

16     show the creation of this new form.  In other words, there

17     is -- if you put it together, if you put mometasone furoate

18     anhydrate in one of the formulations where it's more stable,

19     you don't have a problem.  So it's not a situation here

20     where we can say and carve out that they were dealing with

21     this particular problem.  They invented a brand-new

22     composition of matter, and that opens up, you know, a

23     whole world of what you can do with it, and it solves a ton

24     of problems, but it's because it's a new composition of

25     matter.

```
 1              And, finally, the only thing I want to say, you

 2    know, prosecution history estoppel has to be very clear and

 3    clearly expressed to surrender scope.  So, your Honor, we

 4    respectfully ask that claim 1 be construed to mean

 5    mometasone furoate monohydrate.

 6              THE COURT:  All right.

 7              MR. BARZOUKAS:  Thank you, your Honor.

 8              THE COURT:  Any final words from defendant's

 9    counsel before we go on to the next --

10              MR. REIN:  Yes.  Just very briefly.

11              Counsel for Merck had just mentioned that we are

12    relying upon the doctrine of prosecution history estoppel.

13    That is not correct.  We're not -- our cases that we cite

14    are not prosecution history estoppel cases.  We are citing

15    such as the CVI/beta case, is the separate legal doctrine

16    that if there was a problem identified by the inventors, and

17    it's clearly set forth this is a problem, that the claims

18    can't be construed to cover the problems that the inventors

19    had identified, and so that separate doctrine is different

20    from prosecution history estoppel.

21              THE COURT:  And I guess that does not get us

22    into the chicken and egg situation?  Does the problem have

23    to be identified before the invention, because here I

24    understand it's the opposite, that it was identified, the

25    composition was identified, and then they found something to
```

1    do with it?

2            MR. REIN:  Well, a bit of history.  And as

3    counsel for Merck mentioned, mometasone furoate existed in

4    the prior art.  It was determined -- and that was the '393

5    Shapiro patent.

6            It was then determined, and Merck agrees, that

7    that material that they just called mometasone furoate was

8    actually mometasone furoate anhydrous.  And so the prior art

9    taught mometasone furoate anhydrous.  The prior art also

10   taught in the Shapiro '393 patent that compounds set forth

11   therein, which includes anhydrous mometasone furoate, can be

12   formulated.  Among the ways that it can be formulated is

13   putting it in a nasal spray, which is set forth in the

14   Shapiro patent.

15           So the point is, if Merck is now saying if you

16   take mometasone furoate anhydrous and put it in a nasal

17   spray that is an aqueous suspension and forms MFM, then by

18   necessity it would also happen in the prior art.  Whether it

19   always happened, counsel is saying it might not have always

20   happened.  But the idea of taking MFA and putting it in an

21   aqueous suspension that is a nasal spray is set forth in

22   the, in the prior art.

23           And so they are trying to have it both ways.

24   They recognize that it's in the prior art, but they don't

25   want to say it always occurs so they can avoid, avoid

1   inherent anticipation.  But then they're saying against us

2   as they also said previously against Apotex, well, you have

3   MFA in aqueous suspension, so you infringe.  They want to

4   say we infringe because we have MFA in aqueous suspensions,

5   but, no.  The prior art that taught the same thing, no, that

6   does not inherently anticipate.  And we think that there's a

7   tension there and claims as set forth in White v. Dunbar, a

8   classic Supreme Court case, claims are not a nose of wax

9   that can be twisted and turned one way to avoid invalidity

10   and another way to try to establish infringement.

11                  THE COURT:  All right.  Thank you.

12                  MR. REIN:  Thank you.

13                  THE COURT:  Let's move on.

14                  MR. DAVIS:  Thank you, your Honor.  May it

15   please the Court, Joshua Davis on behalf of Merck.

16                  I will be discussing the second term that is in

17   dispute.  That is pharmaceutical composition comprising

18   mometasone furoate monohydrate.  And very similar to the

19   issue with respect to the first term, the parties here

20   aren't really disputing what any of the words that actually

21   appear in the claims mean.  Instead, Teva is really just

22   trying to insert a limitation into the claim that doesn't

23   have a basis in the words that actually do appear.

24                  Here, that limitation is a limit on the amount

25   of mometasone furoate monohydrate that must be present in

1    the pharmaceutical composition claim by claim 6 in order for

2    it to be -- in order for a composition to be infringing, and

3    that amount specifically is defined by Teva as a

4    therapeutically effective amount.

5         Now, this entire argument is grounded on the

6    faulty premise that both mometasone furoate monohydrate must

7    be an active pharmaceutical ingredient in the claim, and

8    that that active pharmaceutical ingredient, mometasone

9    furoate monohydrate, must be the only active ingredient that

10   appears in the pharmaceutical composition.

11        If we examine the claim language itself, there's

12   nothing in the language of claim 6 that would require

13   pharmaceutical composition, I'm sorry, the mometasone

14   furoate monohydrate to be an API.  It simply says, a

15   pharmaceutical composition comprising mometasone furoate

16   monohydrate in a carrier consisting essentially of water.

17   Further, there's nothing in this claim language that would

18   preclude the possibility of other APIs being present.  And,

19   additionally, there is nothing in this claim that would

20   specify a particular amount of mometasone furoate

21   monohydrate must be present in the pharmaceutical

22   compositions.

23        If we look at other claims that appear in the

24   '353 patent, we see that the patentee clearly understood how

25   to include that kind of language in a claim if it desired.

1    For example, if we look at claim 2, we see an example where

2    the patentee claimed a pharmaceutical composition in

3    which a therapeutic amount was actually claimed.  In this

4    case, an anti-inflammatory amount of mometasone furoate

5    monohydrate.

6              If we look at claim 7, which actually depends

7    directly from claim 6, which includes the term that's in

8    dispute, we see that that claim, the only difference between

9    that claim and claim 6 is that the patentee specified the

10   mometasone furoate monohydrate that's present in those

11   pharmaceutical compositions must be present in an amount

12   from about .1 milligram to about ten milligrams per gram of

13   water.  So here we have the patentee defining the

14   compositions as containing both some therapeutic amount of

15   mometasone furoate monohydrate and as containing some

16   specific range of mometasone furoate monohydrate.  If we

17   look at claim 6, however, there simply is no similar

18   language that would suggest that this claim is limited to

19   compositions that include only a specific amount of

20   mometasone furoate monohydrate.

21             Now, this is important because the only term

22   that Teva can really tie its construction to is the term

23   comprising, but comprising has a specific meaning in patent

24   law, considered a term of art.  And in patent law, when it's

25   used in claim language, it means that the named elements are

1    essential, but that other elements may be added and still

2    form a construct within the scope of the claim.  This comes

3    from the Genentech case that was discussed earlier.

4            Now, in that light, comprising is not limiting,

5    so just because claim 6 says that it is a pharmaceutical

6    composition comprising mometasone furoate monohydrate, that

7    does not preclude the presence of other APIs or any other

8    ingredients whatsoever.

9            Teva has tried to backtrack a little bit from

10   its previous position, which very clearly demonstrated that

11   it considered mometasone furoate monohydrate had to be not

12   only an API, but the only API present.  Now they're

13   suggesting that, of course, Teva understands the term

14   pharmaceutical composition comprising mometasone furoate

15   monohydrate allows for the presence of other ingredients.

16   But if we look at their first brief, we would say very

17   clearly that they suggested that a person of ordinary skill

18   in the art reading claim 6 of the '353 patent would

19   understand the phrase pharmaceutical composition comprising

20   mometasone furoate monohydrate to identify only mometasone

21   furoate monohydrate as the API.  And this is important

22   because Teva's construction would only make sense in the

23   context of if you had a pharmaceutical composition in which

24   mometasone furoate monohydrate was an API and was the only

25   API.  Otherwise, there's no reason to restrict the amount of

1    mometasone furoate monohydrate that must be present or

2    cannot be present.

3            And, again, so in their surreply brief, Teva had

4    suggested that Dr. Smyth's opinion -- Dr. Hugh Smyth is the

5    expert that Teva relies on principally to suggest what a

6    person of skill in the art would, or how a person of

7    ordinary skill in the art would understand pharmaceutical

8    composition comprising mometasone furoate.  And in their

9    surreply brief, they suggest that his opinions don't turn on

10   whether or not the claim term comprising is open-ended or

11   close ended.  If we look at Dr. Smyth's declaration and his

12   deposition testimony, however it's very clear that he does

13   construe, or he understands comprising to be closed and to

14   mean that mometasone furoate monohydrate must be the only

15   API.

16           This quote here at the bottom is from Dr.

17   Smyth's deposition.  And you can see when asked to direct us

18   to any words in the claim that would remove the possibility

19   that the composition of claim 6 contains another API other

20   than mometasone furoate monohydrate, Dr. Smyth simply said

21   that a pharmaceutical composition comprising mometasone

22   furoate, when a person of ordinary skill in the art would

23   look at that, would understand that it means that it's a

24   pharmaceutical composition used to treat where the API is

25   mometasone furoate monohydrate, not any other API.

1          And this is directly contradictory to the way

2    that comprising is understood in patent law.  And if

3    comprising is understood the way it is typically understood

4    in patent law, to suggest that the pharmaceutical

5    composition could include not only mometasone furoate, but

6    any other number of other potential active ingredients,

7    there would be no reason to restrict the mometasone furoate

8    monohydrate present to just a therapeutically effective

9    amount.  In support of its claim constructions, Merck has

10   submitted declarations from both Dr. Trout and Dr. Stephen

11   Durham.

12          My colleague, Mr. Barzoukas, discussed

13   Mr. Trout, Dr. Trout, earlier, and so I won't waste the

14   Court's time going back over his background.  But Dr. Durham

15   is a physician.  He is the section head of Allergy and

16   Clinical Immunology at the Imperial College of London.  He

17   has more than 30 years of experience in treating patients

18   with allergic rhinitis and associated disorders, and he has

19   extensive experience in working with pharmaceutical

20   compositions, including pharmaceutical compositions that

21   contain corticosteroids such as mometasone furoate

22   monohydrate.

23          Dr. Durham confirmed that nothing in claim 6

24   precludes the presence of other APIs or even suggests that

25   mometasone furoate monohydrate need be considered an API at

all for the purposes of the pharmaceutical composition of

claim 6.  And, again, this is just according to the plain

language of the claim and clearly understood meaning of

comprising as it's used in patent claims.

Further, Dr. Durham specified that not only

would a person of ordinary skill in the art not understand

claim 6 to be restricted to only compositions with a certain

amount of mometasone furoate monohydrate, but that a person

of ordinary skill in the art actually would not even

understand the amount suggested by Teva.  That's because

this therapeutically effective amount does not have any

meaning unless you're talking about treating some sort of

specific disorder.

In the '353 patent, because it is directed, as

my colleague, Mr. Barzoukas pointed out, to the discovery of

a new form of matter, a new compound, it wasn't really

concerned so much with specific methods of treatment.  It's

not a method patent that's directed to treating certain

disorders.  Instead, it is a patent that describes a new

chemical entity, potential pharmaceutical compositions

containing that chemical entity, and ways that you can

actually process and form the new chemical entity.

So just to summarize, a person of ordinary skill

in the art, whether they see therapeutically effective

amount, they would only understand what a therapeutically

    1        effective amount is if you are talking about treating a

    2        disorder or if you see some sort of efficacy data.  But no

    3        such data is associated with the '353 patent because it's

    4        not a treating patent.

    5             Finally, Teva again raises the spectre of

    6        needing to construe this patent or this term in order to

    7        preserve the validity of claim 6 and the claims that depend

    8        from it.  But again the patent law is very clear.  The Court

    9        should only go to that doctrine, the doctrine of construing

   10        claims to preserve their validity if a claim term is

   11        actually shown to be ambiguous.

   12             Here, Teva has not pointed to any terms that it

   13        actually contends are ambiguous.  Rather, it simply tries to

   14        insert a limitation into the claim and then asks the Court

   15        to find that if you don't insert that limitation, then the

   16        claim term would be invalid, or the claim would be invalid.

   17        Sorry.

   18             If the Court, or if the Court does address

   19        Teva's enablement arguments that are associated with the

   20        second claim term, we do believe that none of them have any

   21        merit.  For example, both Dr. Durham and Dr. Trout both

   22        provided several examples of how a person of ordinary skill

   23        in the art with their common sense and their knowledge

   24        that's associated with being a person of ordinary skill in

   25        the art would have been aware of multiple compositions in

 1    which you could have both other APIs and mometasone furoate

 2    monohydrate present, specifically mometasone furoate

 3    monohydrate being present in potentially less than

 4    therapeutically effective amounts.  And if you look at the

 5    patent itself, it actually provides such an example.

 6            Now, Teva has tried to discount this example by

 7    saying this example demonstrates the entire problem that's

 8    associated with the patent.  As Mr. Barzoukas pointed out in

 9    association with the first term, that is far too narrow a

10    way of looking at the patent.  Here we have a patent that is

11    directed to a new form of matter and that specifically

12    claims that new form of matter, and that as a separate

13    invention does talk about some pharmaceutical compositions.

14    Even looking at this problem, if it were associated with

15    just the pharmaceutical composition, we see that the problem

16    would only be associated if you were using the compositions

17    with, where you were using long-term storage.

18            So, for example, if a person of ordinary skill

19    in the art looking at this decided, I don't need a

20    composition that's going to be subjected to long-term

21    storage, there would be no reason to not use formulations of

22    anhydrous mometasone furoate, which may contain a small

23    amount of monohydrate due to conversion, but not necessarily

24    a therapeutically effective amount, and there would be no

25    issue with that whatsoever.

1          So just in summarizing, there's no reason to

2     even reach the enablement issues because Teva has failed

3     to point to any claim term that it considers to be

4     ambiguous.  If the Court does reach that issue, they do have

5     no merit.

6          And, further, Teva's construction requires the

7     Court to just completely separate the meaning of comprising

8     from its normal meaning.  It would require the Court to find

9     not only that a pharmaceutical composition comprising

10    mometasone furoate monohydrate meant that the monohydrate

11    had to be an API, but that it had to be the only API that

12    would be present in a pharmaceutical composition.

13          Unless the Court has any questions, that

14    concludes my presentation.

15          THE COURT:  I don't.  Thank you very much.

16          MR. DAVIS:  Thank you.

17          MR. REIN:  May I approach the bench again with

18    slides for the second claim term?

19          THE COURT:  Yes.

20          (Mr. Rein handed slides to the Court.)

21          MR. REIN:  Your Honor, I will now address the

22    second claim term, pharmaceutical composition comprising

23    mometasone furoate monohydrate.

24          This claim term bears on claim 6 and 9 through

25    12 alone.  In this slide you can see the competing

1    constructions for this term.

2         The parties agree that pharmaceutical

3    composition is a composition suitable for treatment.  Where

4    they disagree is whether a pharmaceutical composition

5    comprising mometasone furoate monohydrate must actually

6    contain enough MFM to confer therapeutic efficacy.  Teva's

7    position is that it does.  Merck's position is that it does

8    not.  Teva's argument is based on a common sense reading of

9    patent and intrinsic evidence.

10        Claim 6, and by extension, claims 9 through 12

11   set forth one, and only one active pharmaceutical

12   ingredient, MFM, in the context of Merck's invention.  A

13   person of ordinary skill in the art would understand that to

14   be a pharmaceutical composition, the composition must have

15   therapeutic efficacy.

16        And a person of ordinary skill in the art would

17   also understand from looking at the language of the claims

18   that MFM is the only API identified in the claims, and the

19   presence of MFM is what makes the composition a

20   pharmaceutical composition.

21        Therefore, a person of ordinary skill in the art

22   would understand that because MFM is the sole API identified

23   in claim 6, and the composition of claim 6 must be

24   therapeutically effective, the MFM must confer therapeutic

25   efficacy.

1                    In order to illustrate the differences between

2       the two claim constructions of pharmaceutically, a

3       pharmaceutical composition comprising mometasone furoate

4       monohydrate, we prepared this graphic which identifies four

5       scenarios relating to aqueous suspensions of MFM.  The

6       question is:  Which of these scenarios falls within the

7       scope of claim 6?

8                    Scenario one concerns a subtherapeutic amount of

9       MFM in water with no other APIs.  This cannot be a

10      pharmaceutical composition and cannot be covered by claim 6.

11      If Merck were to dispute this, it would implicate 35 U.S.C.,

12      Section 112, as discussed in Teva's responsive brief at

13      pages 26 and 27.  The '353 patent simply provides no

14      guidance or teaching on how to make or use pharmaceutical

15      compositions containing less than therapeutically effective

16      amounts of MFM that are nevertheless suitable for treatment.

17                   Scenario two concerns a therapeutically

18      effective amount of MFM in water with no other APIs.

19      Teva and Merck both agree that this is covered by claim 6.

20                   Scenario three concerns a therapeutically

21      effective amount of MFM in water with a therapeutically

22      effective amount of another API.  Teva agrees this is

23      covered by claim 6 as well.

24                   Scenario number four is the only case where

25      there appears to be disagreement.  Where there is a

1    subtherapeutic amount of MFM together with a therapeutically

2    effective amount of another undisclosed API, Merck would

3    have the Court believe that this is a pharmaceutical

4    composition comprising mometasone furoate monohydrate.   It

5    is not because -- it is not because there's not enough MFM

6    standing alone in -- the reason is that there's not enough

7    MFM standing alone to confer therapeutic efficacy by itself.

8    As you can see over here, that little subtherapeutic amount

9    is not what would be conferring the efficacy.   It would be

10   all of this other undisclosed API.

11          As explained by Teva's expert, Dr. Smyth, a

12   person of ordinary skill in the art would understand that a

13   pharmaceutical composition comprising mometasone furoate

14   monohydrate must get therapeutic efficacy from the

15   specifically articulated MFM.

16          Now, Merck's counsel has pointed to certain

17   testimony of Dr. Smyth.   What Dr. Smyth was testifying about

18   was that in the context of claim 6, which only identified,

19   as you saw, MFM, that MFM is the specifically identified

20   API, and that that specifically identified API must confer

21   therapeutic efficacy.   Certainly, the claim is open-ended

22   and can cover other APIs, but Dr. Smyth was talking about

23   what was set forth specifically in the claim.

24          And also Merck was talking about their experts,

25   Dr. Trout and Dr. Durham.   Dr. Smyth is all the expert, the

 1    only expert who has significant drug formulation experience.

 2    That is what he does.  He's not a physician and he's not a

 3    chemical engineer.

 4           While the examples of the '353 patent are not

 5    meant to be limiting, they are instructive.  The patent

 6    describes compositions that contain MFM as a sole

 7    therapeutic agent.  All the pharmaceutical composition

 8    examples in the patent use MFM as the sole API.

 9           Example 3 set forth in this slide is

10    representative, but Examples 4 and 5 also have MFM as the

11    sole API.  And just to provide context, Examples 1 and 2 are

12    processes of synthetically manufacturing MFM, which is then

13    used in examples 3, 4 and 5 to make pharmaceutical

14    compositions with that synthesized MFM.

15           To be clear, Teva does not dispute that the

16    claim term at issue is open-ended and thus permits the

17    inclusion of other undisclosed APIs, which is why scenario

18    three falls within the scope of claim 6, but a

19    pharmaceutical composition comprising mometasone furoate

20    monohydrate must contain at least a therapeutically

21    effective amount        of MFM.

22           Teva's construction is also supported by the

23    prosecution history.  In 1999, years after the filing of the

24    original application that became the '353 patent, Merck

25    added new claims.  Among them was new claim 14, which became

1    issued claim 6.  Merck expressly stated to the Examiner that

2    this claim finds support an Example 3 as you can see right

3    here.  In Example 3 as it appears in the issued U.S. patent

4    '353, again identifies only MFM, identifies a very specific

5    amount.

6         Merck never told the Examiner that there was any

7    support for this claim, that is the new claim 14, other than

8    Example 3, which contains a discrete therapeutically

9    effective amount of MFM as opposed to a trace or

10   subtherapeutic amount.

11        Now I will address Merck's claim differentiation

12   argument.  Merck argues that Teva's proposed construction

13   goes against the doctrine of claim differentiation, but

14   Merck does not dispute that no canon of claim construction

15   is absolutely controlling.  This is especially the case

16   here, where the claims only make sense if MFM is present in

17   a therapeutically effective amount.  In any case, Teva's

18   construction does not violate the canon of claim

19   differentiation.

20        Merck argues that since claim 2 recites an

21   anti-inflammatory amount of MFM, it would be co-extensive

22   with claim 6, which under Teva's construction recites a

23   therapeutically effective amount of MFM.  The two claims

24   would not be co-extensive under Teva's construction.  Merck

25   appears to ignore that claim 2 recites a pharmaceutically

1    acceptable carrier while claim 6 recites a carrier

2    consisting essentially of water, and thus the claims clearly

3    have different scope.

4           For example, claim 2 could cover MFM in a tablet

5    form with dry excipients, and that cannot be the case with

6    claim 6 where the carrier consisting essentially of water,

7    essentially, an aqueous carrier.  For this reason, Teva's

8    construction would not violate claim differentiation of

9    these two claims.

10           And Merck's arguments that they made certainly

11    in their briefs that Teva's construction would cause

12    claim 6 and 7 to encompass the same subject fares no better.

13    Claim 7 is directed to a specific range of concentrations,

14    milligram amounts per gram, while claim 6 is directed to a

15    therapeutically effective amount of MFM under Teva's

16    construction.  The therapeutically effective amount that

17    Teva proposes for claim 6 is not necessarily co-extensive

18    with the ranges given in claim 7.  The scopes of the two

19    claims are therefore different.

20           For the foregoing reasons, Teva respectfully

21    asks the Court to adopt its construction for the term

22    pharmaceutical composition comprising mometasone furoate

23    monohydrate, because it is a construction that requires at a

24    minimum that the sole API identified in the claim be present

25    in the therapeutically effective amount.

```
 1              THE COURT:  I have to say I've never -- when I
 2   see phrases like therapeutically effective amounts, I
 3   understand that it is used and I believe that I have used
 4   it in the past, but I've never used it in a vacuum without
 5   any specific disorder or illness attached to the
 6   pharmaceutical composition.  It strikes me that that adds
 7   ambiguity and isn't -- well, certainly adds ambiguity in
 8   my mind.  So I guess I would like you to address that
 9   concern I have.
10              MR. REIN:  Yes.  If you look at the claim term
11   composition, a pharmaceutical composition comprising
12   mometasone furoate monohydrate, we all have to agree that it
13   has to be an amount of mometasone furoate monohydrate
14   present in the claim.  Otherwise, it would be zero.  It
15   would be nothing there.  So we have to agree implicitly that
16   there was an amount.  That's the first point.
17              The second point therefore becomes, so what is
18   that amount once you recognize that there must be an amount?
19   Is it any amount?  Any amount can mean as little as one
20   crystal of the mometasone furoate monohydrate, or does it
21   have to be an amount that makes sense contextually with
22   respect to the claim?  And contextually, you would say it
23   has to be an amount of the sole identified active
24   pharmaceutical ingredient in the claim, it has to be an
25   amount that allows this composition to be suitable for
```

1    treatment, which is what both Merck and Teva agree a

2    pharmaceutical composition is.  And so we need to have an

3    amount of MFM present in the composition so that that

4    composition can be suitable for treatment.  And as for then

5    defining what is therapeutically effective amount, it's

6    actually no different than pharmaceutical composition, your

7    Honor.

8            When you hear the words pharmaceutical

9    composition, they could be anything.  They could be a

10   tablet.  It can be a capsule.  It can be a nasal spray.  It

11   can be an injectable.  It can have different, different

12   meanings.  The same way over here therapeutic,

13   therapeutically effective amount can, we agree, mean

14   different things.  It depends on what the drug is and it

15   depends what the indication is that it would be treated, but

16   that's something that a person of skill in the art would

17   understand if it's present, it has to be present to treat

18   some indication.  Otherwise, if you don't have that, you can

19   have the case of I have a cup of water, and a crystal of MFM

20   falls into that cup of water.  Under Merck's construction,

21   that would be a pharmaceutical composition comprising MFM,

22   and we say that that would be nonsensical.

23           THE COURT:  And so it's clear from the intrinsic

24   record that MFM would always be an API and simply not an

25   excipient that's used for other purposes in a pharmaceutical

1    composition?

2            MR. REIN:  Yes.  Absolutely, your Honor.  That

3    contextually, it is known as an, in reading the patent, as

4    the active pharmaceutical ingredient.  In the beginning of

5    the patent, it talks about its use, for example, as an

6    anti-inflammatory agent.

7            THE COURT:  All right.  Thank you very much.

8            MR. REIN:  Thank you.

9            MR. DAVIS:  If I could address just one issue,

10   your Honor.

11           THE COURT:  Yes.  I would like you to since it

12   would be unclear how much -- I guess the question I had, and

13   you can address your issue as well, is the issue we just

14   talked about, is what amount is sufficient to satisfy the

15   claim.

16           MR. DAVIS:  Sure.  And so, you know, I guess I

17   would start off by addressing the fact that counsel for Teva

18   has suggested that it's clear from the intrinsic record that

19   the mometasone furoate monohydrate must be present in a

20   therapeutically effective amount, but I don't believe Teva

21   has pointed to anywhere in their briefing or anywhere

22   elsewhere that type of language is used in the prosecution

23   history, and certainly there was no disavowal of any

24   composition that contained even small amounts of mometasone

25   furoate monohydrate.

1          I would also direct the Court to cases that we

2    have cited in our briefing that say the core composition

3    claims, when you have composition claims on a chemical

4    entity such as claim 1 where you have mometasone furoate

5    monohydrate, that those claims cover even a single crystal

6    or a trace amount.  For example, SmithKline Beecham, which

7    we discussed earlier, specifically says that if you have a

8    single crystal, and that would be infringing of claim 1.

9          THE COURT:  Even though it's not just a

10   composition or a compound, the claim specifically

11   characterizes it as a pharmaceutical composition, that does

12   not add anything to it?

13         MR. DAVIS:  Well, I'm not suggesting it does not

14   add anything to it, but actually I'm glad this slide is up,

15   because it goes directly to the point that I was going to

16   raise and I think that also will address your question.

17   That is, if we look at scenario four, counsel for Teva

18   had suggested that that scenario should not be covered by

19   claim 6 because it only has a small amount of mometasone

20   furoate monohydrate, an amount presumably that would not

21   impart some sort of therapeutic effect.  But Teva would not

22   argue that that is not a pharmaceutical composition.  It's a

23   pharmaceutical composition with a therapeutically effective

24   amount of a different API in it.

25         And if I could just read from Dr. Trout's

1    declaration, if you remember, we discussed Dr. Trout in

2    connection with the first claim term in dispute, and he is

3    an expert in crystal form and specifically has extensive

4    experience in manufacturing pharmaceuticals and how

5    crystalline forms can be affected during manufacturing.

6             In his declaration he explained that, for

7    example, a person having ordinary skill in the art would be

8    aware that it is not unusual to have the inclusion of

9    multiple crystalline forms of an active pharmaceutical

10   ingredient, API, in a pharmaceutical composition regardless

11   of which form is most stable in a particular composition.

12   In certain instances, traits or substantial amounts of

13   different crystalline forms may arise during the synthesis

14   of the API.  Formulation of the pharmaceutical composition

15   or after, as long as the additional forms do not affect the

16   overall safety or efficacy of the pharmaceutical

17   composition.

18             And so here, if we look at Example 4, and you

19   imagine that the yellow diamonds are anhydrous mometasone

20   furoate that are being used in a pharmaceutical composition,

21   and after -- during formulation or after formulation, some

22   of them begin converting to mometasone furoate monohydrate,

23   that is something that was commonly known to a person of

24   skill in the art.

25             And a person of skill in the art, particularly

1    in looking at the background of the invention, which

2    describes a similar type scenario, would be aware that you

3    could have these issues where you have polymorphs, because

4    remember in the context of a patent, previously, you only

5    had mometasone furoate in the anhydrous form.  Once the

6    inventors have discovered a new form, mometasone furoate

7    monohydrate, a person of ordinary skill in the art in

8    looking at pharmaceutical compositions that contained

9    either form of mometasone furoate would recognize that

10   it would not be uncommon for both forms to be present in

11   small -- lesser or greater amounts.  And so the composition

12   of six where there is no amount specified for the mometasone

13   furoate monohydrate that is present makes perfect sense.

14              THE COURT:  Clearly a broad claim if you are

15   saying that situation four meets your claim construction

16   because a molecule of MFA spontaneously converted to a

17   molecule of MFM.

18              MR. DAVIS:  It may be a broad construction, but

19   it is clearly consistent with the Federal Circuit precedent

20   that says that for chemical entity claims, if you had even

21   trace are amounts or a single crystal, that is still

22   infringing of the compound claim.

23              THE COURT:  So, all right.  So the only

24   difference between one, do you agree that one is not

25   covered by claim 6 because it's not a pharmaceutical

1    composition?

2              MR. DAVIS:  If one were considered to be not a

3    pharmaceutical composition, then one would not be covered.

4              THE COURT:  Well, I mean water in one molecule,

5    MFM, I would assume that would not be considered.  I guess

6    it comes back to -- all right.  All right.  Food for

7    thought.  Thank you very much.

8              MR. DAVIS:  Thank you.

9              THE COURT:  Any final words from defendant?

10             MR. REIN:  Yes, your Honor.

11             A few points.  One, counsel for Merck seemed to

12   imply that pharmaceutical composition claims could have just

13   one crystal of the claimed compound.  The cases they were

14   referring to were the Roche Palo Alto v. Ranbaxy case and

15   SmithKline Beecham versus Apotex case that we addressed in

16   Teva's surreply at page 11.

17             And in both the Roche v. Ranbaxy and SmithKline

18   Beecham v. Apotex case, those were cases that dealt with

19   compounds.  For example, in the SmithKline Beacham case, it

20   covered the compound crystalline paroxetine hydrochloride

21   hemihydrate.  And the Federal Circuit said, that compound

22   was no problem to be solved.  That compound claim could

23   cover a crystal.  There were no pharmaceutical composition

24   claims in the SmithKline Beacham v. Apotex case, and

25   similarly, the Roche v. Ranbaxy case, it dealt with a

1    compound and not a pharmaceutical composition.

2            We are unaware of any case where it's talking

3    about pharmaceutical composition that says that a

4    pharmaceutical composition of compound X could cover merely

5    one crystal of compound X.  That is the first point.

6            The second point, there was a question relating

7    to, what does the therapeutic, therapeutically effective

8    amount mean, what does that mean.  And I addressed that

9    before, but I just want to clarify that the Federal Circuit

10   has held that, quote, "This Court notes that the term

11   effective amount has a customary usage," end quote.  That is

12   at Abbott Labs v. Baxter, at 334 F.3d, 1274.

13           THE COURT:  I understand you used it in the

14   context.  I'm not sure what the context is here.

15           MR. REIN:  Yes.  For example, in the Astra v.

16   Andrx case, 222 F. Supp. 2d, 423 at 481, the Southern

17   District of New York said therapeutically effective amount

18   means an amount that is effective in therapy, or an amount

19   sufficient to provide therapeutic effect.  And so it's a

20   functional term, and we understand that as a functional term

21   conferring efficacy, it can vary compound to compound.  So

22   it's certainly the case.  But it's a term that certainly has

23   meaning that both the Federal Circuit and other district

24   courts have understood.  And I just wanted to make that

25   point.

1              THE COURT:  All right.

2              MR. REIN:  One or two more points.  Dealing with

3    the graphic with the different scenarios, I talked about

4    before scenario one of having a cup of water and a crystal

5    of MFM falling in it, and that would, under Merck's

6    construction, be a pharmaceutical composition comprising

7    MFM.

8              Let's now deal with scenario number four.  We

9    have addressed in our responsive brief at page 23 the idea

10   that there are other nasal sprays that are out there.  One

11   such nasal spray is Beconase.  It's a nasal spray.  It's a

12   steroid in an aqueous suspension.  So it would be like over

13   here, say the yellow would be the active ingredient

14   beclomethasone in Beconase.  What happens if a single

15   crystal of MFM fell into that Beconase nasal spray?  Under

16   Merck's construction, that would be not pharmaceutical

17   composition that's Beconase.  It would be pharmaceutical

18   composition comprising MFM.  Yes, it has the other active

19   ingredient, but according to Merck, you see it has that

20   little MFM that's present over there.  Therefore, it is now

21   suddenly a pharmaceutical composition comprising mometasone

22   furoate monohydrate.

23             And then my last point.  In the prosecution

24   history, we talked about when claim 6 was added.  Claim 6

25   was new claim 14 over here (indicating).

1           Now, we focused on how Merck told the Examiner

2    that there's support for what is now we'll call claim 6 was

3    Example 3, which had defined amount of MFM.  They never told

4    the Examiner, oh, you know what?  You can actually construe

5    our claim just to cover one crystal of MFM.  Never said

6    that.  They instead said that the support was found in

7    Example 3.  And moreover, as you see now, the first sentence

8    over here, they said, I will say new claim 14, which was

9    claim 6, was added to better define the present invention in

10   view of its commercial embodiments.  The commercial

11   embodiment was Nasonex.  Nasonex has MFM present.  It has

12   MFM present in a defined concentration.  It does not --

13   Nasonex is not just one crystal of MFM that's floating

14   around.  And so again they are saying that what is claim 6

15   is best aligned with the commercial embodiment, which is

16   Nasonex, as well as with Example 3, which gives a defined

17   amount.

18           And there was never any indication in

19   prosecution that Merck was going to take what was a claim

20   that people would understand that's limited to a certain

21   amount and then later on in litigation argue a very broad

22   construction, as your Honor has recognized, to cover a

23   situation where, oops, a little bit of MFM formed in

24   something else.

25           THE COURT:  That's certainly not unusual, but I

1    take your point.

2                   All right.   Thank you very much, counsel.

3                   MR. REIN:   Thank you, your Honor.

4                   THE COURT:   Let's take 15 minutes and we'll go

5    on to our next issue.   All right.

6                   (Short recess taken.)

7                               -   -   -

```
 1
 2                   (Proceedings resumed after the short recess.)
 3                   THE COURT:  All right.  I appreciate your
 4      helping to perhaps resolve this issue sooner rather than
 5      later.  I appreciate everyone being here.  I guess those who
 6      have not been introduced before, perhaps now is the time to
 7      introduce yourselves now.
 8                   MR. PHILLIPS:  Good morning, your Honor.  Jack
 9      Phillips on behalf of Apotex, and with me in the courtroom
10      are Joe Jaros, Roy Chamcharas and Matt Anderson of Rakoczy
11      Molino in Chicago, and Megan Haney.
12                   THE COURT:  All right.  Thank you very much.
13      Mr. Belgam?
14                   MR. BELGAM:  Hello, your Honor.  Neal Belgam for
15      Amneal.  I have with me Constance Huttner from Budd Larner
16      in New Jersey.
17                   MS. HUTTNER:  Good afternoon, your Honor.
18                   THE COURT:  All right.  So it's easier for me
19      rather than reading briefing that goes back and forth to
20      actually have you explain to me what the concerns are and
21      how they might be addressed.  So I guess I should start with
22      counsel for Apotex since it is your concern that brings us
23      here today.
24                   MR. JAROS:  Yes, your Honor.  Good morning.  Joe
25      Jaros on behalf of Apotex Inc.
```

1              Very briefly, your Honor, we think the parties

2    are in agreement with respect to the standard that should

3    govern here and that's the two-part disqualification

4    standard from your Honor's Syngenta opinion.  You may recall

5    it's a very similar spell standard, was there a confidential

6    relationship with the expert.  That's number one.

7              Number two was what the case has called

8    confidential and privileged information provided to that

9    expert.

10             As we understand Merck's brief in this case,

11   your Honor, those facts are not disputed.  The expert's name

12   here is Dr. Jeremy Cockcroft.  He was our testifying,

13   Apotex's expert in a previous litigation.

14             And there is no dispute either in Merck's brief

15   or with Dr. Cockcroft's declaration that, in fact, he had

16   both, number one, a confidential relationship with Apotex;

17   and, number two, in fact, he received confidential and

18   privileged information from Apotex through the trial of that

19   matter.

20             The key issue we see, your Honor, in Merck's

21   brief is as follows.  Merck concedes the statement of the

22   standard in your Honor's Syngenta case.  Merck concedes the

23   facts underlying the motion, and as we understand it, Merck

24   has a single argument and that is procedural.

25             Merck says essentially, Apotex is a non-party.

 1      None of the cases are directly on point, so essentially none

 2      of the cases' reported disqualification decisions involve

 3      our facts here, which are unusual, and I will get into

 4      those.

 5             But as we understand Merck's principal point,

 6      it's a procedural point.  They say because Apotex is not a

 7      non-party, it's okay that Dr. Cockcroft, although previously

 8      retained by Apotex, can testify on the same subject matter

 9      in this litigation.

10             Your Honor, as we explained in the brief,

11      that goes squarely against the objectives and the policies

12      underlying that standard.  Very simply, there's an obvious

13      conflict of interest.  And to just briefly explain the

14      facts underlying this, your Honor, earlier this year Merck

15      sued Apotex again on the same patent at issue in the Amneal

16      and Teva cases, and the same product, Merck's Nasonex

17      product.

18             Shortly thereafter we contacted Apotex.  My firm

19      contacted Dr. Cockcroft, said Merck has sued us again.  We

20      would like to continue working with you under our previous

21      engagement letter, which is of record with the Court, and

22      Dr. Cockcroft responded that he didn't feel comfortable

23      working for Apotex because he was currently working for

24      Merck against Teva.

25             We then let Dr. Cockcroft know that we objected

1    to that.  We reminded him that his engagement letter was

2    ongoing, including particularly an exclusivity provision

3    that expressly states he cannot do consulting work for

4    Schering, which became Merck later.  And initially Dr.

5    Cockcroft responded that given the conflict and the issue,

6    he wouldn't feel comfortable working with anyone, with

7    Apotex or Merck on mometasone.

8           Shortly thereafter we understand that Merck's

9    attorney assured Dr. Cockcroft that it was okay, that he

10   wouldn't be violating his engagement letter with Apotex,

11   that he could continue working with Merck, at which point

12   Dr. Cockcroft agreed not to do any work for Merck pending

13   resolution of the issue, which led to our meet and confer

14   efforts, which ultimately led to the briefing we've

15   submitted to the Court.

16          Those are the facts, your Honor.  What we see as

17   a very simple legal issue is, does the two-part test, the

18   standard Syngenta test apply for disqualification?  The

19   answer is yes.  The only other issue is whether Merck's

20   procedural argument makes sense.  We think it does not.  In

21   fact, we think the Coke Refining case that we cite in our

22   brief is right on point.

23          On page 1181 of that case, at that time, the

24   Fifth Circuit made clear that, as we said in the brief,

25   Federal Courts have the inherent power to disqualify, and

1       then the Coke Court gave two examples.  One is a very simple

2       situation where, in fact, Merck and Apotex would be in the

3       same litigation, and Apotex would have retained Dr.

4       Cockcroft, done substantial work, and then switched sides.

5       That's a classic side-switching situation.  It's the same

6       parties, same litigation.  The expert literally just flips

7       over to the plaintiff or defendant, respectively.

8               The Coke Court then goes on to say, well, in

9       those not-so-simple cases where we're not just switching

10      sides within a litigation, we're coming up with a two-part

11      test, and that two-part test is set forth on page 1181.

12      Quote, "In disqualification cases other than those in which

13      the expert clearly switched sides, meaning within the same

14      litigation, lower courts have rejected a," quote, "bright

15      lined," end quote, rule and have adopted the following

16      test.

17              First, was it objectively reasonable for the

18      first party who claims to have retained the expert to

19      conclude that a confidential relationship existed?

20              Second, was any confidential or privileged

21      information disclosed by the first party to the expert?

22              Now, Merck reads that word "party" as being

23      limited to a party to the litigation at the same time.

24      That's not, in fact, what the Coke decision says, but then

25      the Coke decision goes on and clarifies that on page 1182 by

1    referring back to the first part of the standard.  Quote,

2    "Initially, a Court must determine whether the retaining

3    party," and here that would be Apotex and the expert, here,

4    Dr. Cockcroft, "had a relationship which permitted the

5    retaining party reasonably to expect any communication would

6    be maintained in confidence by the expert."

7           So the Coke decision makes very clear that you

8    have a simple case with simple facts where say Dr. Cockcroft

9    is working for Apotex and then in the middle of that

10   litigation switched sides and went to work for Merck.

11   That's a bright line test.  That's simple.  He would be

12   disqualified in that litigation.

13          Here we have an unusual situation because Apotex

14   is not either a party to the Amneal or Teva cases, although

15   Amneal was recently sued by Merck.  But Apotex is clearly

16   the first party who retained Dr. Cockcroft, and they are

17   clearly the retaining party as that term is used in the Coke

18   decision.

19          Your Honor, we submit that solves any potential

20   procedural concern, particularly in view of the policy

21   objectives that underlie that, which is to protect.  Here,

22   the confidential and privileged information that Apotex

23   provided to Dr. Cockcroft in the previous litigation, which

24   is not disputed, and also to maintain integrity.

25          And in a brief, your Honor, we cited to Judge

1    Stark's decision in Power Integrations, where he, in

2    reliance on your Syngenta decision, referred to it, what a

3    reasonable observer would think.  And the question he posed

4    with respect to the policy considerations, would a

5    reasonable observer believe that Dr. Cockcroft had switched

6    sides?  In fact, your Honor, we think Dr. Cockcroft has

7    already answered that for us.

8               When we called him and said, are you willing to

9    work with us again on the Merck v. Apotex litigation that

10   was filed back in April of this year, he said, I wouldn't be

11   comfortable doing that because I'm now working for Merck.

12   I'm on the other side.

13              So we submit, your Honor, even Dr. Cockcroft

14   recognizes the obvious conflict of interest of working

15   extensively through trial for Apotex on the same patent and

16   the same Nasonex product at issue here, and now switching

17   sides and working for Merck both in the Amneal and Teva

18   cases on the same patent and the same Nasonex product.

19              On that point, your Honor, I think you will hear

20   Merck argue that the products at issue aren't the Nasonex

21   product.  Merck argues in its brief that it's the generic

22   products.  So Apotex has a product that again Merck has sued

23   Apotex on in April of this year in the District of New

24   Jersey.  Amneal has a generic product and Teva has a generic

25   product.

1              As your Honor knows from previous Hatch-Waxman

2    litigation, those products are required to be equivalent.

3    So it appears that what Merck is saying is, well, because

4    the products are different, these suits are sufficiently

5    different that they don't involve the same thing.  So Dr.

6    Cockcroft can testify about the subject matter of the Amneal

7    and Teva cases, but he won't be testifying about the same

8    subject matter he testified about for Apotex in the Apotex

9    case.

10             Your Honor, frankly, that argument does not make

11   sense.  Even the cases Merck cites say that when you have

12   the same patent in the litigation, that's enough.  Here we

13   have the same patent, the '353 patent, and to be clear, that

14   was the original, the patent in the original Apotex

15   litigation.  It's currently the patent in Merck's suit

16   against Apotex in New Jersey and obviously it's the patent

17   here in both the Amneal and Teva cases.  And even if the

18   Court were to look to the generic products, we submit, your

19   Honor, although Merck is not clear what the issue is and

20   what type of testing they will have Dr. Cockcroft do, the

21   products we're talking about, the Apotex, Amneal and Teva

22   products, are by definition considered equivalent by the

23   FDA.  And, in fact, because here we're talking about a nasal

24   spray product, the FDA has even more specific guidelines,

25   something called Q1, Q2, which means the FDA says, all

1    generic versions of Nasonex must be qualitatively and

2    quantitatively the same in certain respects.

3            So to suggest, your Honor, that we can slice up

4    Dr. Cockcroft's mind and his testimony according to product

5    seems somewhat disingenuous because Merck's own cases,

6    including the Bone Care case, state that if the same patent

7    is at issue, the matters are obviously related, the expert

8    is obviously talking about the same information, technology,

9    art, et cetera.

10           With that, your Honor, I want to turn to the

11   practical reality.  So for a number of reasons, Merck argues

12   that while Dr. Cockcroft really hasn't switched sides

13   because these cases are about something different than the

14   old Apotex case, we think that breaks down and it ignores

15   the practical reality of where Dr. Cockcroft's engagement

16   here would go.

17           As an initial matter, your Honor, Dr. Cockcroft

18   submitted a declaration to this Court.  He didn't attach his

19   engagement letter with Merck, so we don't know what it says.

20   We don't really know what the scope of that engagement will

21   be.  What we do know is that Merck and Apotex are

22   adversaries on the same product and the same patent in New

23   Jersey right now, and we also know the practical reality of

24   where Dr. Cockcroft is headed in these litigations.

25           Merck's papers make it clear that Merck will ask

1     Dr. Cockcroft to testify that the Amneal and Teva products

2     contain monohydrate.  That was the precise issue in the

3     first Apotex litigation, and that's the precise issue set

4     for a motion to dismiss in Judge Sheridan's courtroom on

5     Monday in the Merck v. Apotex litigation.  It's really

6     difficult to parse the technology here.  It's the same

7     patent and the same Nasonex product.

8             In response to Merck having Dr. Cockcroft

9     testify here that he has found monohydrate in the Amneal and

10    Teva products, we expect Amneal and Teva to compel, to seek

11    to compel Dr. Cockcroft's opinions in the Apotex case and

12    all the bases that are relevant, which will put all of his

13    work in the Apotex New Jersey litigation at stake here, and

14    any privilege that existed will be at risk, which is a key

15    element in the cases we cited to your Honor.

16            It's the Court's duty in evaluating the two-part

17    test to protect privileges.  Again, there's no dispute that

18    Dr. Cockcroft had privileged information.  Through his

19    testimony in this case he will be offering opinions on the

20    same technology and patent, and I am certain Amneal and Teva

21    will argue that they're then entitled to his previous

22    opinions on the same patent and the same product and all of

23    the underlying data which is currently protected by a

24    confidentiality order in New Jersey.

25            Now, again, Merck argues that they won't tell us

1      what Dr. Cockcroft's opinions will be, but they say they're

2      going to be really different than his opinions in the Apotex

3      case.  We don't know that.

4              THE COURT:  And that doesn't actually matter,

5      does it?

6              MR. JAROS:  It certainly does not matter to

7      Apotex or the legal standard.  The legal standard we think

8      is very clear.  And we also can't see the future, your

9      Honor.  I can't predict what Dr. Cockcroft will testify to,

10     but the subject matter is so closely related, there's not

11     even a question under the case law.  Typically, these cases

12     are, we consulted Dr. Jones for three hours and then he went

13     and worked for the other side.  Here, we're talking about

14     dozens of hours through trial on the same product that is

15     currently being litigated by Merck against Apotex in New

16     Jersey.

17             And I want to get back to Judge Stark's analysis

18     of your Syngenta decision where he described this reasonable

19     observer test.  Again, Merck says, well, Dr. Cockcroft will

20     be talking about something totally different here and

21     they're different products because they're Amneal and Teva,

22     not Apotex.  Well, if you if you are a reasonable observer,

23     that reasonable observer will hear both Amneal and Teva

24     argue that no matter what opinions he offers here, there's

25     an inconsistency in his previous opinion.

1          So in the Apotex case, of course, Dr. Cockcroft

2    testified that he did not see sufficient analytical evidence

3    of the monohydrate.  Those positions will be at issue.

4    There's no way those positions will not be at issue if Dr.

5    Cockcroft provides any opinions here.  A reasonable observer

6    would see that as switching sides.  In the Apotex case, he

7    didn't see sufficient evidence.  In this case Merck suggests

8    he will find evidence of this monohydrate in two generic

9    versions of the same Nasonex product.

10          That raises one last point, your Honor, and I

11   wanted to emphasize it.  This is an unusual fact pattern.

12   It is unusual that a non-party intervenes to come and seek

13   disqualification.  It was necessary, of course, because Dr.

14   Cockcroft has our privileged information and this is the

15   only way we can protect it in these cases.

16          But Merck emphasizes there's no case on point.

17   That procedurally, this is unusual.  We agree, that's true.

18   There is no case perfectly on point involving intervention

19   under this fact pattern.  But there's also no case where any

20   Court has found or even suggested that there's a procedural

21   requirement in this accepted and established two-part test.

22   Either the two-part test is met or it's not.  And it just

23   does not matter whether Apotex is protecting itself in the

24   same litigation with Merck that's still pending in New

25   Jersey, or whether we're protecting our information here

```
 1        from disclosure to not only Merck, but Apotex's competitors,

 2        Amneal and Teva.

 3                    There's also no case where a Court stated that

 4        despite the two-part test it's acceptable to put an adverse

 5        party's confidential and privileged information at risk

 6        simply because it will be used against other defendants,

 7        which is what we understand Merck to be saying.  So this

 8        won't really hurt Apotex because we're using it against

 9        Apotex's competitors.  I believe as your Honor observed,

10        that does not matter.  It's still confidential and it's

11        still privileged.

12                    Even if there were a procedural requirement,

13        your Honor, and we don't believe there is, our case isn't

14        that simple.  As I mentioned earlier, Merck in April filed a

15        complaint against Apotex on the same patent, on the same

16        Nasonex product, so even if there were some unusual

17        procedural requirement inserted into the two-part test,

18        Merck and Apotex are currently adverse.

19                    Merck I believe ten days ago threatened to move

20        for an injunction in the New Jersey action, and again we

21        have the argument set on Monday on our pending motion to

22        dismiss.  At that hearing on Monday, Merck is going to seek

23        a schedule from the Court for emergency relief against

24        Apotex.

25                    To us, your Honor, that is the thing that locks
```

1      the analysis.   Merck and Apotex are currently adverse.

2      Merck has access to our testifying expert from the previous

3      litigation on the same subject matter against Apotex, so

4      although Dr. Cockcroft in his declaration says I promise not

5      to use that other information, frankly, we don't see how

6      that's possible, and Judge Stark observed the same thing.

7      He said, even the most honorable expert with the highest

8      integrity won't be able to cordon off in his mind the

9      information from the previous litigation from his work with

10     Merck in these litigations, particularly where Merck is also

11     currently adverse to Apotex in New Jersey.

12             With that, your Honor, unless the Court has any

13     questions, I'd like to reserve just a little bit of time for

14     reply.

15             THE COURT:   Sure.

16             MR. JAROS:   Thank you.

17             MR. BARZOUKAS:   May it please the Court, your

18     Honor, I will try to address everything to set everything

19     clear because I think there may be some confusion.

20             First, let me start with the idea that Dr.

21     Cockcroft has switched sides here, and I think this --

22             THE COURT:   Well, maybe I should start with my

23     concerns.

24             MR. BARZOUKAS:   Certainly.

25             THE COURT:   And you can address them in your own

1    way.

2              It strikes me that if the issue presented, which

3    was essentially presented to me in the claim construction

4    argument, if the issue is essentially the same in all of

5    these litigations, and if this expert has presented an

6    opinion on this issue that one can only expect would be

7    different if he's representing the brand as opposed to the

8    generic, then his previous opinions and the data upon which

9    those opinions were based have got to be relevant to this

10   litigation, which exposes the confidential information to

11   discovery.  So even if it isn't an issue now, it would

12   become an issue when there's a violation of the protective

13   order.  It strikes me that this is the time to address the

14   issue now.

15             MR. BARZOUKAS:  So let me address your

16   particular question right now and then I will go through the

17   rest of the issues I wanted to raise.

18             So with respect to the very last issue you

19   raised, which is bringing into issue the opinions he

20   rendered in the previous case and rendering some of the

21   facts that he based upon his opinions at risk in this case,

22   Dr. Cockcroft was a testifying expert in open court in that

23   case.  Any opinion he rendered in that case, all the bases

24   and facts upon which he based his opinions are no longer

25   protected as a testifying expert.  Once Apotex chose to make

1    him a testifying expert, any of the facts, any of the bases

2    for his opinions in that case are no longer protected.

3           THE COURT:  I didn't understand it to be that

4    way.  Otherwise, why would you all in all these patent

5    litigations continue to keep everything under seal?  I mean,

6    I'm always getting requests after the fact to change the

7    protective order in order to allow non-parties or to have

8    access.  So I don't think that's absolutely correct.

9           MR. BARZOUKAS:  Well, and that perhaps would be

10   true if it's kept under seal because the testimony and

11   opinions were given in closed court under seal.  But Dr.

12   Cockcroft's testimony in the previous Apotex case, your

13   Honor, was in open court.  So there is no preservation.  Any

14   question that goes to the bases of his opinions in that case

15   had could be asked and there's no claim of protection and

16   privilege.

17          The courtroom was never closed.  But --

18          THE COURT:  I don't think --

19          MR. BARZOUKAS:  But I can -- and I think the

20   Federal Rules are very clear.

21          THE COURT:  Nothing is very clear.  Are you

22   really telling me, because you all don't practice it this

23   way, that all the information, all the data, the millions,

24   you know, the million documents that an expert looks at that

25   are always confidential, that as soon as he renders an

```
 1    opinion that it all relates to that million documents are

 2    all of a sudden not privileged anymore, are not confidential

 3    anymore?  I never understood it to be that way.

 4              MR. BARZOUKAS:  Well, they can be asked about

 5    them.  Since there was done in open court, all the materials

 6    that he based his opinions on were discoverable and could be

 7    asked in open court since he gave his opinions in open

 8    court.

 9              If Apotex was concerned about the particular

10    facts, data, or anything that forms the basis of the

11    opinions that Dr. Cockcroft gave in that previous case, they

12    would have closed the courtroom, and at other different

13    times during that case they did close the courtroom.

14              But, your Honor, also with respect to the

15    confidentiality issues, keep this in mind.  If one was to

16    adopt that idea, that means that experts we used in the

17    prior case who had access for the opinions they rendered in

18    that case to all of the same Apotex information, we wouldn't

19    be able to use the experts we used in that case in this case

20    if that was the rationale, because under that theory, our

21    experts in that case had access to all of the Apotex

22    confidential information.

23              So --

24              THE COURT:  But --

25              MR. BARZOUKAS:  So let's say we were to use our
```

1    experts --

2              THE COURT:  But they were under the protective

3    order, and they were under the protective order with a

4    degree of loyalty to you as a client.

5              I guess I don't even understand, with all due

6    respect to this expert, why you're even, of all the people

7    in the world, why you believe this is a good idea and

8    getting us into all of this satellite litigation?

9              MR. BARZOUKAS:  And I will explain it, your

10   Honor, but let me go back with respect to the confidential

11   information to the expert.  This is absolutely central in

12   the way I understand you at least to be thinking at this

13   point, because if the idea is that just because Dr.

14   Cockcroft was exposed to all of this confidential

15   information that Apotex wants to keep confidential, our

16   experts in that case were exposed to all of that

17   confidential information of Apotex that Apotex wants to keep

18   confidential.

19             To give you an example, Dr. Trout was exposed to

20   confidential Apotex information.  If the idea is that just

21   because an expert that had access to that confidential

22   information, if they render opinions in this case, will

23   thereby put at risk the confidential information of the

24   other party, that same logic would apply, for example, to

25   Dr. Trout, because if Dr. Trout renders an opinion or

1      another expert we used in that case renders an opinion in

2      this case, they also had access and rendered opinions based

3      upon the Apotex confidential information in that case.

4              So if the fact that they rendered opinions in

5      that previous case based on confidential Apotex information

6      is what would make that information somehow vulnerable in

7      this case, the same would apply with respect to the experts

8      we used, who have, by the way, exactly the same access to

9      Apotex's information that Dr. Cockcroft did.  If that

10     standard applies, then we couldn't use the same expert that

11     we used before.

12             THE COURT:  Well, that's a ridiculous scenario

13     because no one would be asking them to divulge that prior

14     because their decision, their opinions are consistent.  So I

15     mean I look at practicalities.  So --

16             MR. BARZOUKAS:  And, your Honor, if the issue of

17     the opinions or there's an issue inconsistency would be an

18     issue, I think you wouldn't see us in this case wanting to

19     use Dr. Cockcroft.

20             And if you have any questions, let me know.  I

21     will try to address some of the issues that Mr. Jaros

22     raised.

23             First of all, with the idea that we're dealing

24     here with switching sides because we're dealing with the

25     same product, and many times he said, this is about Merck's

1    Nasonex product.  As we all know, this is not about Merck's

2    Nasonex product.  In every case it's about the product that

3    the generic is putting to market, and the issue with respect

4    to infringement in these cases is whether when you do

5    particular analytical testing on that product, whether you

6    find the claimed compound, mometasone furoate monohydrate.

7    And even in the previous case, before the Court in New

8    Jersey, Apotex took the position that using this same

9    formulation is not really what makes the product.  In other

10   words, when you look in these cases with respect to whether

11   you end up with an infringing product, you have to consider

12   the entirety of the product.  That, for example, includes

13   exactly what ingredients and materials are used in the

14   container for the product, and that's seminally important,

15   and Apotex admitted that.

16            So in each case, whether it was the Apotex

17   product in the old case, what we believe to be an Apotex new

18   product now, and that's where the new case exists, or the

19   different products that Amneal and Teva has, it's not really

20   the same issue.  And the simple aspect of what, for example,

21   an expert like Dr. Cockcroft does is looking, simply looking

22   at the product and determining whether there is a presence

23   there of the infringing form of mometasone furoate.  In this

24   case, mometasone furoate monohydrate.

25            And, by the way, and I think this is actually

```
 1    quite relevant.  In the prior case Dr. Cockcroft didn't do

 2    any testing.  He simply critiqued or opined with respect to

 3    testing other people did.  He never actually took Apotex's

 4    product and did his own testing.  So his role in this case

 5    is actually quite different.  And if we thought that the

 6    issue here was an inconsistency with what he did in the

 7    old case, I think you would recognize, that would not be

 8    who he want to use.  We don't believe there's any

 9    inconsistency, and there's no difference here in creating

10    an inconsistency.  And, in fact, and this is in Professor

11    Cockcroft's declaration, your Honor.  In fact, the

12    analytical work he's doing in this case and would be doing

13    in this case has no relevance to the analytical work

14    about -- from other people that he was opining in that case.

15    In fact, there wasn't anything that had come up or could

16    come up in that case.

17              So this idea that somehow there is privilege

18    contamination of what Dr. Cockcroft did between that case

19    and this case cannot even happen because the actual work

20    he's doing is very different.  It's not -- you know, not

21    only is it not related in any way, but it couldn't even be

22    conceived of at that time.  So there is no question that

23    there's no contamination from the work he would have done

24    back then to the work he would have done now.

25              Also, I said I'm going to take some of these
```

1    issues perhaps out of order, but as they come up, I wanted

2    to address them, because Apotex also raised the issue about

3    a new case against Apotex, and I don't know if they are

4    trying to insinuate that there is -- I think they do

5    insinuate that there is some issue related with respect to

6    that case.

7           Your Honor, the way from a timeline perspective

8    this happened was that we actually received a notice about

9    Teva copying the product in around mid-2014, and I think we

10   filed the first of these two lawsuits in July.  That's when

11   we contacted Dr. Cockcroft, and we set out both in our brief

12   and in his declaration why he has some particular skills and

13   some particular ability to do analysis that is unique among

14   experts.  At that time, having had that case, we contacted

15   him.  The case, the former case with Apotex had ended for

16   about two years at that point.  He had, he considered his

17   engagement with Apotex terminated.  It was the past two

18   years he was engaged for that case, and we started working

19   with him.

20          One of the first things we talked about was we

21   weren't going to discuss -- and this is, by the way, was an

22   understanding on both sides -- we weren't going to do or

23   discuss anything about Apotex.  This was simply doing this

24   new type of work that never came up in the previous case

25   against these different products by Teva and Amneal.

```
 1                    Now, and after we had started our work with Dr.

 2    Cockcroft, it was not until very late in 2014 that we

 3    started, that we got to a point where we realized that

 4    Apotex may be intending to come onto the market with a new

 5    product, and that's what necessitated the suit that

 6    Mr. Jaros mentioned that was filed in April.

 7                    So this is not an issue of contacting an expert

 8    while they were working with another party or somebody we

 9    knew was going to be another party.  And he mentioned that

10    they called Dr. Cockcroft and wanted to continue in their

11    agreement.  The problem with that is, their agreement with

12    Dr. Cockcroft had terminated.

13                    Now, I want to go back and address the issue of

14    the fact that they keep referring to these as being the same

15    product.  There is absolutely nothing inconsistent with

16    perhaps one of these products showing conversion and another

17    one perhaps not.  They are different products with respect

18    to the causes, what causes stability of one form over the

19    other or not.

20                    So, for example, we view it as absolutely not

21    inconsistent, for example, that Dr. Cockcroft opined in that

22    case that he didn't see work that reflected the presence of

23    mometasone furoate monohydrate, and he may find it in

24    another, in a different product.  So there is absolutely

25    nothing inconsistent.
```

1           With respect to the analysis as to whether these

2    products contain mometasone furoate monohydrate, they are

3    different products.  And, again, this is, and we have it

4    cited in our brief, your Honor, and it is in the opinion

5    from a New Jersey Court.  Apotex told the Court that product

6    in that case didn't mean just the collection of ingredients

7    you mix into the nasal spray.  It included all the

8    components of the bottle.  And the reason they said that,

9    your Honor, is because the components of the bottle make a

10   difference as to whether you have conversion or not.

11           So, for example, if every product was the same,

12   we would not have the New Jersey case.  Our contention is

13   they are changing their product.  Therefore, there's no

14   res judicata to be applied because we have a new product at

15   this point and that's the whole basis of the new case.

16           Now, going back to some of the more general

17   issues with respect to disqualifying an expert, I think your

18   Honor would recognize it's an extremely harsh remedy and

19   it's very rarely applied, and as far as we know, it has only

20   been applied where an expert was going to testify against

21   the prior client of the expert for whom they had information

22   and were being adverse to a prior client.

23           So all of the standards that Apotex cites with

24   respect to receiving confidential information that could be

25   used against them, that's not the case here.  Professor

1    Cockcroft is not testifying against Apotex.  He is

2    testifying against Teva/Amneal, and there's no contention

3    that with respect to the standards for disqualification,

4    Professor Cockcroft never had any duty towards Teva or

5    Amneal and he never received any Teva or Amneal information.

6    And, again, as I said, there is nothing inconsistent with

7    him being able to find mometasone furoate monohydrate in

8    their product, and perhaps another product.  Next year there

9    may be another generic that tries to copy a product, and for

10   all I know, after testing, their product may show that it

11   doesn't convert, and there would be nothing inconsistent in

12   that situation.

13          Mr. Jaros also talked that these are the same

14   products because of FDA bioequivalence, but, again, this is

15   very misleading.  Bioequivalence has to do with how the drug

16   reacts once it goes into the body and what happens with

17   respect to levels of concentrations in the body.  That's the

18   FDA guideline with respect to bioequivalence, and the term

19   bio is because it's once it's in the body.

20          The fact that the products could be different,

21   some have conversion, some not have conversion, has

22   nothing to do with the requirement of bioequivalence,

23   your Honor.

24          And, your Honor, one way to look at this I think

25   that perhaps will give it some lucidity, because it is a

1      very strange situation, and this is a case where Apotex is

2      trying to seek to disqualify Dr. Cockcroft where he's not

3      attempting to testify against them, where there is no risk

4      of their information coming at risk, but no more risk than

5      us using the experts we've used in the previous case who

6      also had their information in the previous case.

7                  And the fact that if you had an attorney, if we

8      look at the rules for attorney practice and conflicts of

9      interest, if there was an attorney that had worked at the

10     Rakoczy law firm on that case, the previous case for Apotex

11     and that attorney -- let's say that attorney had left and

12     they had come to Baker Botts.  You know, they would have

13     been walled off because Merck is a current client, and

14     let's say this case came up and we said, you know about

15     mometasone furoate monohydrate, would you like to work on

16     it?  If you look at the attorneys' ethics rules, so long

17     as that attorney doesn't work against Apotex there is

18     nothing wrong with them having been brought in let's say

19     last July when we filed this case to work against Teva.

20     And that's very clear, because they are not, they wouldn't

21     have been adverse to Apotex, your Honor.  And we think

22     there's something wrong to apply a more strict standard to

23     an expert than we would apply to lawyers who have very

24     extensive ethics rules.

25                 Finally, your Honor, it does not seem that --

1    and again, this is very important.  Like I said, there's

2    absolutely -- because of the type of testing that

3    Professor Cockcroft is performing, there's absolutely

4    no risk there's any contamination from the work he did in

5    the prior case, and this is something that if your Honor

6    wants additional information on, we have no problem

7    presenting that to you in-camera.  Obviously, the exact

8    parameters of what he's doing at this point until expert

9    reports would be submitted, which isn't too far from now,

10   is not open.  It would become open once expert reports

11   would be submitted.

12          But again it's very important to understand that

13   the type of analytical work he's doing here has absolutely

14   no relationship to anything considered or could possibly be

15   considered during the previous case, and he can very easily

16   explain that.

17          So we believe, your Honor, that given the

18   standards for disqualification, this is not a situation

19   where the expert is testifying against the former client.

20   It's not a situation where information that he has could be

21   used.  It's not a situation where anything he might have

22   even been exposed to or learned given the way he's doing,

23   you know, the analytical work he's doing in this case could

24   be contaminated from the previous case.

25          Your Honor, I would be very happy to answer any

1    questions you have.

2                    THE COURT:  I think I will allow Apotex's

3    counsel to address the four issues that I identified as

4    being raised by you and then I may well have questions after

5    that.

6                    MR. BARZOUKAS:  All right.  Thank you, your

7    Honor.

8                    THE COURT:  So the four issues that I see is

9    that, number one, the relationship was terminated and there

10   doesn't have to be some drop dead date where you're not

11   necessarily bound by a former engagement letter.

12                   Two, although it might be the same issue, we are

13   talking about different products and a different analyses

14   that Dr. Cockcroft is performing in this case.

15                   Number three, the case law really is directed to

16   experts who are switching sides in the sense they are going

17   to be testifying against a former client, and this certainly

18   isn't that case.

19                   And, number four, there's really no risk of

20   access to confidential information because, once again, the

21   analyses are so different that -- and I guess the public

22   nature of his prior testimony.  Anyway, those are the

23   concerns that you need to address.

24                   MR. JAROS:  Yes, your Honor.  The first as to

25   the relationship between Apotex and Dr. Cockcroft.  There

1    are actually two separate issues, and your Honor ordered Dr.

2    Cockcroft to appear, and we're prepared to examine him on

3    these issues.

4            The engagement letter we read as very clear.

5    The engagement letter retained him with respect to sharing

6    the Apotex mometasone zone nasal spray litigation.  It

7    didn't identify a case number.  It wasn't limited to a

8    particular case.  And as your Honor knows, these types of

9    cases often result in serial litigation.

10           So the express terms of the engagement letter

11   were with respect to Merck v. Apotex and mometasone patent

12   litigation.  There's currently a Merck v. Apotex mometasone

13   patent litigation in New Jersey, which is why we contacted

14   Dr. Cockcroft and said, they've sued us again.  We'll need

15   your help.

16           THE COURT:  And so you think that's a reasonable

17   interpretation of the letter that he's forever bound to

18   represent Apotex and no one else as long as his product is

19   going on?  I mean, that strikes me as a little odd.

20           MR. JAROS:  I hope I didn't imply that, your

21   Honor.  The terms of the engagement are very clear.  It's

22   with respect to, limited to mometasone nasal spray

23   litigation.

24           These litigations are often serial.  So upon

25   expiration of the patent, obviously, the engagement would

1    end because there can be no further litigation.  But

2    oftentimes, your Honor, our experts, either in the middle of

3    a case, at the end of a case, at the settlement stage, after

4    trial, after appeal, contact us and say, we've been

5    contacted about this compound.  Are we free to work on it?

6    And that's the way in the industry these are handled all of

7    the time.

8              We have never had an expert without telling us

9    go work against the adverse party.  And I want to identify

10   the two separate issues in the engagement letter, your

11   Honor.  Maybe there is an argument that a reasonable person

12   would read the engagement letter as limited to the first

13   litigation even though the terms were not.  The exclusivity

14   provision is much different.

15             So what Dr. Cockcroft does in his declaration is

16   acknowledge he is currently under the confidentiality

17   obligations in that letter.  No one is disputing that those

18   aren't terminated, that those don't have the particular

19   endpoint.  Your client gives you confidential information.

20   You keep it confidential forever.  The same is true with

21   respect to the exclusivity provision.  It's in the same

22   paragraph.  It's equally clear.  By agreeing to be our

23   expert in this case, you will not switch sides and testify

24   against us on this particular product, and it specifies with

25   respect to Schering or Merck.

1            So we don't see it as unreasonable at all

2     regardless of whether Dr. Cockcroft was reasonable in

3     believing the engagement had ended.  Certainly, his

4     confidentiality obligations, he agrees, have not ended,

5     and the exact same should be true of the exclusivity

6     provision.

7            So --

8            THE COURT:  Of course, he's not technically

9     testifying against Apotex.  Is that right?

10            MR. JAROS:  He isn't.  He is not at this point,

11    your Honor.  We don't know whether they will seek to have

12    him testify against Apotex in the New Jersey litigation.  We

13    think he would be obviously disqualified from doing so just

14    for the same reasons.  It's the same two-part test that

15    would disqualify him in New Jersey that would disqualify him

16    here.

17            So, your Honor, to be clear, the engagement

18    letter has that provision to avoid just this problem.  So

19    what Dr. Cockcroft's conduct has now done is create this

20    question as to what may happen, what has he already

21    disclosed, what has he unwittingly disclosed?  We solved

22    that problem in two ways.  One is with the engagement letter

23    saying, well, obviously, you can't go work for our adversary

24    on the same product because that gives our adversary, Merck,

25    our information.  And Merck is currently suing us again, so

1    that's extremely damaging to us.  Everyone recognizes that.

2    It's a standard part of engagement letters.

3              With that, your Honor, Apotex does contend a

4    relationship continues, the engagement continues because the

5    engagement letter is not so limited, but even putting that

6    aside, certainly, the exclusivity provision, which is

7    intended to protect our privileged and confidential

8    information from our adversary, Merck, survives even if the

9    engagement had ended.

10             Second, your Honor, is the different products,

11   different analyses point.  Again, we don't know.  We really

12   don't know the answer to either of those questions.  For all

13   I know, the Amneal and Teva products are identical in all

14   respects.

15             We would submit, your Honor, we're working too

16   hard here.  The case law does not require the Court to make

17   a specification-by-specification comparison.  One of the

18   cases cited by Merck, the Bone Care case, states, quote,

19   "In a patent infringement case such as this one, a

20   substantial relationship can be shown if the confidential

21   information shared with the expert concerns the specific

22   patent, that's enough, or technology at issue in the present

23   litigation," end quote.

24             Both of those are obviously true.  Not only is

25   it the exact same patent, but the question will be the same

1    no matter how they phrase it or how they spin it, is, is

2    there monohydrate present in the generic product?  It does

3    not matter what test you use.  It does not matter if it is a

4    new machine or old machine.  The question is:  Has Dr.

5    Cockcroft found monohydrate?  And that will be inconsistent

6    certainly according to Amneal and Teva with everything he

7    said in the Apotex litigation.  It's really difficult to try

8    and split the hair of these are different products.  The

9    patent is the same.  The technology described in that patent

10   is the same.  Either one of those under their own Bone Care

11   case is sufficient.

12          With respect to the testing, your Honor, both

13   Dr. Cockcroft and Merck have told us that the testing is

14   different.  For example, confused based on the brief and the

15   papers, they say that PXRD was at issue in the previous

16   case, and Dr. Cockcroft is a specialist and an expert in

17   that area, but here he's doing something different.

18          So there appears to be an inconsistency.  I'm

19   not sure what different type of testing he might be doing,

20   but they have not revealed that to Apotex or the Court.  And

21   again we submit we're working too hard.  We should not have

22   to conduct an investigation into what Merck now claims as

23   privileged information as to what type of testing it's doing

24   to determine whether there is a conflict.

25          There's obviously a conflict.  He switched

1    sides.  He's talking about the same product, which is

2    the Nasonex product that is in every complaint in all

3    three actions.  It's the reason we're here.  But for the

4    Nasonex product and the Orange Book listing, we wouldn't be

5    here.  And, again, we don't know whether the generic

6    versions of Apotex and Amneal and Teva are different in any

7    way.  We don't know that.  They could be identical in every

8    respect.

9            The third point, your Honor.  The case law with

10   respect to a, the unusual procedural stance here, which is a

11   non-party coming in to protect its information in related

12   litigation.  I did not hear Merck address the Coke case,

13   which was the original case that all the Courts cite,

14   including, your Honor, the Syngenta decision.

15           The Coke case again provides two scenarios.  One

16   is the simple case, the easy case.  Apotex and Merck are in

17   litigation.  Dr. Cockcroft works many hours for us, so

18   there's no question there's a relationship, and then for

19   whatever reason he switches sides in that same litigation.

20   That's an easy case.  There's a bright line test.  Automatic

21   disqualification.

22           The other test set up by Coke and followed by

23   Courts around the country, including this district, is a

24   two-part test.  And the two-part test does not say is the

25   party a litigant in this action?  It says, is the first

1    party to retain him, or the retaining party, do they have a

2    confidential relationship that's undisputed?  And in the

3    course of that confidential relationship, did they disclose

4    confidential privileged, protected work product

5    communication?  That's undisputed.  Merck's counsel did not

6    say a word on that issue because it's undisputed.

7            So we submit, your Honor, the two-part test is

8    therefore reasonable.  We don't need to engage in satellite

9    litigation.  We don't need to investigate whatever type of

10   testing Merck is talking about that they won't disclose.  We

11   can simply look at the two-part test and ask those

12   questions, and then as Judge Stark suggested, look at the

13   policy considerations.  Does it look like he's switching

14   sides?  Do we need to answer the question what type of

15   equipment will he be using to answer the question, does it

16   look like he's switching sides?  A reasonable observer would

17   say, yes, he worked for the generic on the same product and

18   he has now switched sides.

19           I believe the fifth and final point, unless I've

20   missed one, is the public nature of the testimony.  We agree

21   with your Honor.  I'm not aware of any authority that

22   suggests that an expert testifying in court, although his

23   trial testimony did become public and the trial decision

24   became public, it does not offer any of the details.  It

25   does not provide the details of Apotex's product.  It does

1       not disclose the many, many data sets that he reviewed and

2       were analyzed.

3                   And I want to raise just one point, your Honor,

4       that occurred to me.  Sorry.  I'm going to skip back to an

5       issue.

6                   With respect to the test results, I do

7       understand Merck's argument, which is Dr. Cockcroft is doing

8       some type of different test here.  That may or may not be

9       true.  Without knowing what the test is, I can't know.  What

10      I do know is that in response to that, I would expect Amneal

11      and Teva to conduct the exact same PXRD testing that was at

12      issue in the Apotex litigation.

13                  So no matter what Dr. Cockcroft does, the exact

14      same type of testing that was at issue in the Apotex

15      litigation will be back at issue in these litigations, which

16      gets to your Honor's point of, well, no matter what happens,

17      the underlying bases for his opinions will become at risk,

18      and not just what he said at trial.  Right.  That's not what

19      we're talking about.  We're talking about the confidential,

20      privileged, protected and work product communications in the

21      deposition preparation, in drafting the expert report, in

22      preparing him for trial.  That, there's no dispute, is still

23      protected and has not been disclosed in any way, through

24      trial testimony or otherwise.

25                  With that, your Honor, I hope I addressed all

1    five issues.

2                    THE COURT:  You did.  Thank you.

3                    Let me hear once more, and then if anyone wants

4    our witness on the stand for focused testimony just to make

5    sure that we have the best record we can get, then I will go

6    to that.  But let me hear from counsel for plaintiff.

7                    MR. BARZOUKAS:  May it please the Court, your

8    Honor, with respect to the Coke case, again, it is a case

9    where we're dealing very plainly with an expert switches

10   sides.  There's a reason that there has never been an expert

11   disqualified who is not testifying against his former

12   employer, his former client.  And, again, we can't ignore

13   the fact that even under the very stringent real ethics

14   rules for attorneys, this is not a situation where an

15   attorney, because they worked for Apotex could not work

16   against Teva and Amneal, and that does happen in law firms

17   all the time, your Honor, and it doesn't contradict the

18   ethics rules.

19                    The idea that Dr. Cockcroft entered into an

20   agreement that was -- that would in perpetuity exclude him

21   from the entire field relating to mometasone furoate is not

22   reasonable, and, in fact, in his declaration he sets out

23   that there's -- you know, that's not a way he has ever

24   construed these agreements, and he would never sign an

25   agreement that would tie him out from an entire field of

1    technology for the rest of his career without some sort of

2    retainer.  It's not a reasonable interpretation of the

3    agreement they have arrived to.

4              Again, Mr. Jaros raised the issue about whether

5    these products are truly different.  He has backed off some

6    because now we do know that Apotex represented to the Court

7    in New Jersey that if the containers are different, for

8    example, that's a different product.  And he says, well, I

9    don't know if they are.

10             Your Honor, we set it out in our brief.  There

11   are publicly available pictures of the Apotex product from

12   the previous litigation, and upon examination of that

13   product with the products, the proposed products for Teva

14   and Amneal, it's very clear with a visual inspection of the

15   actual products that Teva and Amneal are proposing and the

16   photographs that Apotex has available of its product, that

17   we're talking about different products.  They certainly are

18   not in the same containers.  And given exactly their

19   representations that Apotex made to the Court in New Jersey,

20   they are different.

21             THE COURT:  So it does not matter if it's the

22   same patent, the same technology, the same issue?

23             MR. BARZOUKAS:  All right.  Let's address

24   whether it's the same issue, the same patent, the same

25   technology.

1          THE COURT:  Well, we know it's the same patent.

2    Right?

3          MR. BARZOUKAS:  Well, but here's the issue.  If

4    this was somebody who testified about the validity of the

5    patent, that would be exactly right.  But think about what

6    the work of Dr. Cockcroft was.

7          Dr. Cockcroft's work, you're going to construe

8    the claim.  We just talked about claim 1 earlier this

9    morning.  You're going to decide whether claim 1 mometasone

10   furoate monohydrate or it means furoate monohydrate and

11   whatever else.  What Dr. Cockcroft does is he examines the

12   product.  Like we said, a different product than before, and

13   he determines whether the product has mometasone furoate

14   monohydrate.  That has nothing to do with the patent.  He's

15   not learning information about the patent.  He's taking what

16   the claim construction that you are going to arrive at, and

17   he's going to determine whether the product he looks at

18   shows, based on analytical testing shows the presence of

19   that ingredient.  Now, that has nothing to do, there's no

20   limitation as to methods in the patent.  It has to do with

21   the analytical tools he uses to determine whether it's there

22   or not.

23          So this idea that if somebody has testified

24   about a specific patent, they can't, this is not really the

25   situation here.  Dr. Cockcroft is simply doing an analytical

1    test to determine whether a particular compound is present

2    in a product or whether it's not present in the product.

3              And with respect to it's the same technology,

4    that goes again, your Honor, to the very clear fact the

5    analytical methodology he's using here has nothing to do and

6    couldn't even have anything to do with respect to the work

7    he did or any discussions he would have had in the previous

8    case.  So there's no danger of contamination.

9              The point that they raised about whether, about

10   they don't know if Dr. Cockcroft might testify against them,

11   that's not an issue for now.  And, second of all, he has not

12   been retained to testify against them.  And I can tell them

13   right now, he's not going to testify against them.  And,

14   again, this is not the issue for this case.

15             The fact that they claim in the previous case he

16   dealt with what is called PXRD technology, powder X-ray

17   diffraction technology, your Honor, and he was an expert in

18   that and that it's inconsistent with him doing something

19   else here, the fact he was an expert in that particular

20   technology doesn't mean he does not have very specific

21   expertise in other areas of technology, and in fact that

22   underscores this issue about same technology.  What he's

23   doing is not the same technology.  It's very different.  And

24   it does not relate, as we set out in our brief and his

25   declaration, it does not relate to PXRD.  And the only

1   opinions he gave in the prior case related to PXRD, so he

2   never really dealt with the patent.  He never really -- he

3   only dealt with PXRD technology, which is not what he's

4   doing in this case.  So we don't really have the issue of

5   same patent, same technology, your Honor.

6          And the idea he also raised was, well, maybe

7   Teva and Amneal are going to do PXRD testing.  Well, again,

8   this is completely speculative and nobody knows if they will

9   or won't, but, you know, I have no problem saying that, you

10  know, there's no, there's no reason we have to use Dr.

11  Cockcroft to comment or opine with respect to the PXRD

12  testing.  So I think that's a very easy carveout.

13         So, your Honor, that is it.  If your Honor would

14  like, we can -- and, again, it's going to be somewhat

15  limited to the question.  Dr. Cockcroft established that

16  there is no relationship between the work or any discussions

17  he would have had with Apotex attorneys in that case and

18  what he is doing here.  And, again, your Honor your Honor

19  the fact that he testified in that case, once they put him

20  on the stand to express his opinions, anything he relied

21  upon was open.  The fact that everything was not used

22  doesn't mean that they didn't open it up.

23         So to us, it seems a bit strange to claim that

24  you're going to retain, that your intent was to retain facts

25  upon which an expert got up and gave opinions as

1     confidential at that point.  I mean --

2                THE COURT:  Well, I disagree with you about

3     certain points, but it strikes me that as long as we've

4     brought the good doctor here, we should put him on the stand

5     and you should at least give him a chance to convince me of

6     everything you've said and then there will be an opportunity

7     for a bit of cross.  All right?

8                MR. BARZOUKAS:  Dr. Cockcroft?

9                MR. BELGAM:  Your Honor, can Amneal be heard

10    just on one point before the doctor takes the witness stand?

11               THE COURT:  Yes.  Sorry.

12               MR. BELGAM:  Thank you.

13               MS. HUTTNER:  Good afternoon, your Honor.  I'm

14    Connie Huttner from Budd Larner for Amneal.

15               Just briefly on this issue, and it's largely not

16    our dog that's in this fight, but a couple of points.

17               One, I just wanted to respond to the suggestion

18    that Dr. Cockcroft had to be retained by Merck because he's

19    the only one who has a particular expertise or access to

20    particular equipment, and I think his declaration mentioned

21    something called the synchotron, which while I'm not, you

22    know, remotely an expert in that, I believe is a kind of a,

23    what I would call a souped-up type of XRPD or has the

24    capacity to take very high capacity XRPD.

25               So I don't know whether that is what he plans on

1    doing in this case, but I would note that, you know, we as

2    defendants in our case, and I don't know what Teva is doing,

3    but there are certainly without, with respect to Dr.

4    Cockcroft, there are many people who have expertise in this

5    area, both in the United States and Europe, and I just, I

6    think your Honor made the comment earlier that I'd like to

7    echo it.  You know, it's kind of like the line from

8    Casablanca, of all the gin joints in the world, how did you

9    end up in mine?

10                  There are lots of people that Merck could have

11   hired and I just find it curious that they would reach out

12   to Dr. Cockcroft who testified on the precise issue of

13   infringement, you know, on the other side of the case.  So

14   that's one point.

15                  The second point, your Honor, is, and I think we

16   alluded to this in our submission.  We and Apotex share the

17   same API.  I don't know about the rest of the formulation

18   because I don't have access to that information.  But, and I

19   don't know what Dr. Cockcroft may or may not know about that

20   because I don't have access to that information.  I likewise

21   don't know what Merck plans on doing with Dr. Cockcroft.

22   But I do think it's not a completely separate issue.

23                  We are talking in all three cases about, you

24   know, an anhydrate-based formulation that is bioequivalent

25   to the brand.  There may or may not be differences in the

1     bottles.  I don't know that.  I likewise don't know whether

2     that matters or whether it's covered by the claim or whether

3     it's germane to anything.  But clearly there's overlap.  And

4     at the end of the day, Dr. Cockcroft testified on the very

5     issue on the opposite side in the prior case that he would

6     have to testify to here.

7                    Finally, your Honor, last point.  There is no

8     question, Mr. Jaros has alluded to this, there is no

9     question that Amneal will be seeking, you know -- if Dr.

10    Cockcroft goes forward, that we'll be seeking full discovery

11    of all information relating to his prior testimony as well

12    as to the prior testimony of Dr. Metzger, who is Merck's

13    other expert.

14                   With respect to Dr. Cockcroft, I just want to

15    note for your Honor that we had requested production of

16    that, and I believe that Teva may have too, and the response

17    that we've gotten from Merck is that they can't produce it

18    because it contains Apotex's confidential information.

19                   So we're kind of hamstrung in both directions.

20    We can't, we can't evaluate what he knows.  We can't

21    effectively cross-examine him if he's going to proceed in

22    this case without getting deeply into that prior case and

23    his testimony in that case.  And that's all I wanted to add.

24    Thank you, your Honor.

25                   THE COURT:  All right.  Thank you very much.

1              MR. BARZOUKAS:  Your Honor, if I may say one

2    thing to those comments?

3              THE COURT:  Sure.

4              MR. BARZOUKAS:  I'm going to make it very brief.

5              I think Ms. Huttner just described to you why

6    this makes no sense with respect to only Dr. Cockcroft.  She

7    just said that if she gets an opinion from Dr. Metzger,

8    Merck's expert in that case, they will seek all the

9    information he based it on, which is exactly what I was

10   describing to you, that this in the end would mean that we

11   couldn't even use the experts we used in the case before.

12   She just said she would seek all the underlying information

13   from Dr. Metzger if he gave an opinion, which is the expert

14   we used.

15             So if the idea is that if any expert based

16   opinions in that case and they had access to the information

17   of Apotex just as our experts did, then if the rationale is

18   that we can't use Dr. Cockcroft because of that reason, then

19   same as she described would apply to Dr. Metzger.

20             THE COURT:  That makes no sense to me, so leave

21   that one.  I just don't embrace that line of reasoning at

22   all.  So I think we should put this witness on the stand.  I

23   have to leave at 1:30, so I want to make sure we conclude

24   this proceeding before I have to leave.

25                    PLAINTIFF'S TESTIMONY

Cockcroft - direct

1              ... JEREMY KARL COCKCROFT, having been

2         duly affirmed as a witness, was examined and

3         testified as follows ...

4              THE COURT:  And this is awkward, the way this

5    courtroom is set up, so I don't want you to cringe your

6    neck.  So you can direct your answers to your counsel and I

7    will not take offense to it.

8              THE WITNESS:  Thank you, your Honor.

9                    DIRECT EXAMINATION

10   BY MR. BARZOUKAS:

11   Q.    Dr. Cockcroft, good afternoon.

12   A.    Good afternoon.

13   Q.    And thank you very much for coming to court today.

14              THE COURT:  Yes.  I want to thank you as well.

15   Thank you.

16   BY MR. BARZOUKAS:

17   Q.    And I'm going to keep this very brief on a couple of

18   issues that were raised.  First, I want to address, you

19   heard Apotex relate to the idea that the engagement they had

20   with you with respect to mometasone was in essence in

21   perpetuity.  Can you give is the Court your understanding of

22   that provision of your agreement with Apotex?

23   A.    Yes.  My understanding of the agreement, and I have

24   many agreements, similar style from Rakoczy, is that it's

25   for a particular case.  The context of me saying a

Cockcroft - direct

1      particular litigation coming up, what I had as an expert in

2      a particular case.  And therefore although there's no

3      particular dates given for termination, I would assume that

4      once it goes to trial or the case is settled without trial,

5      that my services are finished with.  In practice, I've

6      always waited before a case goes to appeal.  The case comes

7      up at the appeal stage.  And this has been for not just

8      contract with Rakoczy, but in general acting as an expert,

9      going on for two decades now.

10                 I've had two contracts where there have been

11     specific termination dates.  I think I even have one from

12     Rakoczy mentioned a one-year period.  I have one for a

13     two-year period.  I would presume those to allow time for

14     appeal.

15     Q.     Would you ever agree to be excluded from an entire

16     area in perpetuity?

17     A.     Not without compensation.  I think it would be

18     unreasonable.

19     Q.     And were you compensated in this case in what you

20     would consider to be excluded in perpetuity from working

21     with mometasone?

22     A.     No, I was not.

23     Q.     Dr. Cockcroft, is the testing that you expect to

24     undertake in the cases against Teva and Amneal, is it in any

25     way related to the work you performed in the previous Apotex

Cockcroft - direct

1    case?

2    A.    No.  Your Honor, the testing is completely different.

3    I couldn't even conceive of the testing back at that point

4    in history for several reasons.  In the first instance, I

5    didn't even have access to equipment that you would do those

6    tests, but even if I did have access, it was purely a chance

7    discovery.  In fact, six months before I was engaged by

8    Merck that I discovered, well, I could do this type of test.

9    So in that sense the tests are completely different.  And,

10   very strongly, it's not clear purely testing.

11   Q.    In the prior Apotex case, did your opinions only

12   relate to PXRD?

13   A.    That is correct.

14   Q.    And does your testing that we expect to do in the

15   Teva/Amneal case, does it relate to PXRD?

16   A.    No, it does not.

17   Q.    And can you explain a bit more why you could not

18   conceive of that testing at the time of the prior Apotex

19   case?

20   A.    Well, as I just said, your Honor, first of all, we

21   didn't have the equipment.  Technology moves on in terms of

22   scientific equipment, and there was -- this particular piece

23   of equipment I'm using simply did not exist in my laboratory

24   at that time.  But, secondly, it was a chart for

25   preservation, doing an experiment for that colleague that

Cockcroft - direct

1    led me to believe that one could do testing that wasn't

2    conceived of at the time of the Apotex/Merck trial.  And

3    that was roughly about six months before Merck contacted me

4    did I realize what the instrument could do, even if it had

5    specifically been bought for that purpose.  I recognized the

6    capabilities that weren't pushed by the manufacturers, shall

7    we say.  I realized that it could do things that I hadn't

8    realized before.

9    Q.    And finally, Dr. Cockcroft, do you believe that it is

10   possible that you had any discussions, conversations or

11   received information from Apotex's counsel that would relate

12   to the testing you expect to do in the Teva and Amneal

13   cases?

14   A.    No.  As I say, conceptually, I wouldn't have had any

15   knowledge of the experiments, so I couldn't have discussed

16   it.

17              MR. BARZOUKAS:  I said I would be brief, your

18   Honor, and I'm finished.

19              Thank you very much, Dr. Cockcroft.

20              THE COURT:  Thank you.

21              THE WITNESS:  All right.

22              THE COURT:  Cross-examination.

23              MR. JAROS:  Thank you, your Honor.  May I

24   approach the witness?

25              THE COURT:  Yes.

Cockcroft - cross

**CROSS-EXAMINATION**

BY MR. JAROS:

Q.    Dr. Cockcroft, I'm handing you a copy of your

declaration as an exhibit.

            MR. JAROS:  And, your Honor, would you like a

copy as well?

            THE COURT:  Sure.

            (Mr. Jaros handed an exhibit to the Court.)

            THE COURT:  Thank you.

BY MR. JAROS:

Q.    Dr. Cockcroft, by the way, I'm Joe Jaros.  I represent

Apotex.  We've been in communication on other matters

before; correct?

A.    Sure.  Yes.  I know your name.

Q.    Good to finally meet you in person.

            Before I get to your declaration, you had

mentioned that you had sort of a typical practice where you

assume when an engagement ends.

      Do you recall that testimony?

A.    Yes.

Q.    Have you ever gone to work for what was your adversary

before or is this the first time?

A.    I think this is probably the first time.  I don't

recall a specific case.

Q.    Okay.  Let's turn to paragraph 14 of your declaration,

Cockcroft - cross

1    please.

2                    Do you have that?

3    A.    Yes.

4    Q.    The first sentence reads, quote, "Additionally, the

5    products that are at issue in these cases are different

6    than the product that was at issue in the Apotex case," end

7    quote.

8                    Do you see that?

9    A.    Correct.

10   Q.    How do you know that?

11   A.    Different manufacturer.  So to assume that -- what I'm

12   saying is that in terms of a particular product, you have a

13   list of things that go into it, but how they are put

14   together could vary from one manufacturer to another.  I

15   don't know the details necessarily of how Teva or Amneal

16   makes their product.

17   Q.    Would you agree with me that without having the Apotex

18   product next to the Amneal product next to the Teva product

19   along with the specifications for all three products, you

20   don't know whether they're different; is that correct?

21   A.    Well, in terms of the original specification, I mean,

22   typical ingredients, then the ingredients could be the same

23   is what I'm saying.  If you are saying it is something that

24   has, then it's different.

25   Q.    They could be different, but you don't know?

Cockcroft - cross

1   A.      No, sure.  In that sense, one would test.

2   Q.      Do you know whether all three of those products, the

3   Apotex and the Amneal and Teva products, are considered

4   bioequivalent?

5   A.      That is not my expert area, but I would assume in

6   terms of the fact that the FDA allows them, that they'd have

7   to be bioequivalent.

8   Q.      Do you know what Q1, Q2 refers to in the FDA

9   regulatory language?

10  A.      No.  Sorry.  I don't.

11  Q.      So you don't know whether the FDA requires all generic

12  versions of Nasonex to be Q1 and Q2?

13  A.      No.  I'm not familiar with Q1 and Q2.

14  Q.      Please turn to paragraph 16 of your declaration, and

15  I'm looking at the last sentence.  Can you please turn to

16  that.

17          There you say, quote, "Such work has nothing to

18  do with a completely different product, especially one that

19  I, myself, never tested," end quote.

20          Do you see that?

21  A.      Yes.

22  Q.      Again, you don't know that it's a completely different

23  product, do you?

24  A.      I can't be sure, no, but I do know it's made by a

25  different manufacturer.

Cockcroft - cross

1    Q.    And do you understand that in the Merck v. Apotex

2    litigation that's currently pending in New Jersey, Merck has

3    suggested that they've conducted some type of unidentified

4    analytical testing on Apotex's product in Canada?

5    A.    I don't recall.  I'm not familiar with that, no.

6    Q.    Do you know whether the test method that you referred

7    to earlier, shall we call it a method or a technique?  What

8    did you say you discovered?

9    A.    Technique.  We can use the word "technique."

10    Q.    Technique.  You do know whether the analytical

11    technique that you suggested you're going to be using in

12    this case is the very same technique that Merck has already

13    used against Apotex in the New Jersey case?

14    A.    I have no idea.

15    Q.    Please turn to paragraph 9.  In paragraph 9 you refer

16    to your typical practice that you talked about earlier.

17    Focus on the word "assume."  Do you see that?  That you

18    assume that your attention to a particular case has

19    concluded?

20    A.    Yes.

21    Q.    Is that your typical practice across the board?  You

22    do always assume when a particular engagement has ended?

23    A.    Unless there's something in the contract contrary.  I

24    mean, as I just said, sometimes there have been terms put in

25    engagement letters that would prevent me looking at say a

Cockcroft - cross

1      particular API in the first year or maybe first two years

2      after trial, but in the absence of those terms, then I think

3      it's reasonable to presume that I was engaged purely for

4      that particular litigation.

5      Q.    All right.  So your typical practice includes reading

6      the express terms of the engagement letter; right?

7      A.    Yes.

8      Q.    And in this case you didn't call your client, Apotex,

9      or my law firm, Rakoczy Molino, to ask whether the

10     engagement had ended; is that right?

11     A.    That's correct.

12     Q.    Let's turn to paragraph 10 of your declaration,

13     please.  Now, paragraph 10, you referred to an ongoing

14     obligation of confidentiality.

15              Do you see that?

16     A.    Correct.  Yes.

17     Q.    That does come from your engagement letter; right?

18     A.    Yes, it comes -- certainly from the engagement letter,

19     yes.

20     Q.    Okay.  Let's look at the engagement letter, please.

21     It's attached to your declaration.  The confidentiality

22     provision is in the third paragraph; is that right?

23     A.    Correct.

24     Q.    And it states, quote, "By this letter, you and others

25     working with you agree to maintain as confidential all

Cockcroft - cross

1  documents and information supplied to you as well as all

2  conclusions and communications regarding your services," end

3  quote.

4              Do you see that?

5  A.    Correct.

6  Q.    We agree that that is an ongoing obligation?

7  A.    Yes.

8  Q.    And in your declaration you say you will comply with

9  that obligation though?

10  A.    Right.

11  Q.    Now, in the same paragraph, the last sentence reads,

12  quote, "You also agreed not to provide consulting services

13  relating to mometasone to other individuals, including, but

14  not limited to Schering," end quote.

15              Do you see that?

16  A.    Correct.

17  Q.    And you understand Schering has become Merck through

18  acquisition?

19  A.    Yes, I do.

20  Q.    But you believe that that provision ended?

21  A.    With the specification, yes.

22  Q.    So in the same paragraph you acknowledge that the

23  confidentiality obligation is ongoing, but you believe the

24  exclusivity provision terminated the day the appeal ended?

25  A.    Yes, I do.

Cockcroft - cross

1    Q.    All right.  What do you see in that sentence that

2    suggests the exclusivity provision terminated the day the

3    appeal ended?

4    A.    Simply because the whole letter, there would have been

5    also a phone call prior to that letter referring to a

6    specific litigation action.  It didn't refer to, you know, a

7    continuous litigation.  It referred to a specific test.

8    That was my understanding of it.

9    Q.    And let me try and ask a better question.  Do you see

10   anything in the language I've read, you also agree not to

11   provide consulting services, et cetera, that suggests that

12   that provision terminated upon the appeal ending?  Anything

13   in that sentence?

14   A.    Not in the sentence taken out of context, no.

15   Q.    Do you have an engagement agreement with Merck for

16   this case?

17   A.    Almost certainly I will have one, yes.

18   Q.    Is it a written engagement agreement?

19   A.    Yes, it will be a written one.

20   Q.    Why wasn't it attached to your declaration?

21   A.    I didn't see the need.  I didn't see the need for it

22   to be attached in the sense that when your firm contacted

23   me, the disputes were more about my previous contract than

24   the current contract.  Some were issues with the current

25   contract.

 1    Q.      Is your engagement agreement with Merck limited to the

 2    Merck v. Teva and Merck v. Amneal cases?

 3    A.      Initially, it was only Merck v. Teva as far as I

 4    recall.  It goes back to July 2014.

 5    Q.      At some point was it extended to cover the Amneal

 6    case?

 7    A.      I think I signed a confidentiality agreement saying

 8    the Amneal case subsequently, but there was not a fresh

 9    contract.

10    Q.      Does your engagement agreement with Merck mention

11    Merck v. Apotex litigation?

12    A.      No.

13    Q.      Does it have any of the statements about keeping

14    Apotex information confidential that you provided in your

15    declaration?

16    A.      I can't remember it mentioning Apotex at all.

17    Q.      I'm sorry?

18    A.      I can't comment on it.

19    Q.      To the best of your memory, the Merck engagement

20    agreement does not even address your prior work in the Merck

21    v. Apotex litigation; is that right?

22    A.      To the best of my memory, yes.  I don't recall any

23    reference to Apotex no.

24    Q.      And I know we asked this several months ago, but I

25    will ask it again.  Currently, are you willing to work for

Cockcroft - cross

1   Apotex in the pending Merck v. Apotex litigation?

2   A.    No.  I would feel uncomfortable having taken

3   litigation with Merck to work for Apotex in this particular

4   litigation.  As I said, I've been working for Apotex in

5   other litigations, and as far as I know, I'm still doing so

6   for your firm.

7   Q.    And the words you just used that you would be

8   uncomfortable working for Apotex given your engagement with

9   Merck, that's what you told us back when we first contacted

10  you; is that correct?

11  A.    Yes.  Essentially, they were the words I used.

12  Q.    Something feels wrong about working for Apotex against

13  Merck when you're currently engaged with them in this

14  litigation; is that correct?

15  A.    To me, that was, yes.  That, I would feel

16  uncomfortable with that.

17  Q.    In the Merck engagement, have you been provided a

18  retainer?

19  A.    When you say "retainer," do you mean an ongoing fee

20  for my services, or --

21  Q.    A fixed amount of money to begin working with Merck?

22  A.    A contract with Merck, yes, in terms of being paid for

23  any work that I do.

24  Q.    Okay.  I will make it simpler.  What's your hourly

25  rate for Merck?

Cockcroft - cross

1    A.    I think it's about $500 an hour.  I couldn't be sure.

2    I'm not money driven.

3    Q.    All right.  About how many hours have you spent to

4    date on both the Merck v. Teva and Merck v. Amneal

5    litigations?

6    A.    I have not totaled them up, so I don't know.

7    Q.    Please give us your best estimate.

8              MR. BARZOUKAS:  Your Honor, let me object

9    because this sounds like to me it's going to call for

10   speculation if he does not know.

11             THE WITNESS:  I really don't know.

12             THE COURT:  I'm not confident how relevant this

13   is in any event.  I think you should move on.

14   BY MR. JAROS:

15   Q.    And, finally, Dr. Cockcroft, let's turn to paragraph

16   2 of your declaration.  In paragraph 2 you mentioned you

17   were contacted by an attorney for Baker Botts back in July

18   2014.

19             Do you see that?

20   A.    Correct.  Yes.

21   Q.    Who specifically was the attorney who contacted you?

22   A.    I was contacted by Joshua Davis.

23   Q.    And throughout the course of your engagement with

24   Merck, both on the Teva and Amneal cases, which Merck

25   attorneys by name have you worked with other than Joshua

1   Davis?

2   A.   Well, the attorneys here in the room.  Just the --

3   Q.   Mr. Barzoukas and Mr. Davis?

4   A.   Yes.  Yes.

5   Q.   Anyone else?

6   A.   I don't recall working with anyone else, no.

7   Q.   Let's turn to paragraph 12.  In paragraph 12 you refer

8   to the nature of your engagement.

9          Do you see that?

10  A.   Correct.  Yes.

11  Q.   And do you know whether you'll be asked to prepare

12  expert declarations in the Teva and Amneal cases?

13  A.   I would assume so.

14  Q.   Do you know whether you'll be asked to prepare expert

15  reports in the Teva and Amneal cases?

16          MR. BARZOUKAS:  Objection, your Honor.  This is

17  something that at this point of the consulting expert

18  doesn't have to be disclosed.  I mean, that's at this point.

19  He's just a consulting expert up to now.

20          THE COURT:  All right.  I agree.

21          MR. JAROS:  Okay.  I will move on.

22  BY MR. JAROS:

23  Q.   I believe I understand Merck's position, but I need to

24  ask the question anyway.  Dr. Cockcroft, can you identify

25  the type of testing that you talked about earlier,

1    specifically what type of testing you're doing for the

2    Amneal and Teva cases?

3              MR. BARZOUKAS:  Objection, your Honor.  Again,

4    as a consulting expert, we'll be happy to provide

5    information in-camera, but, you know, until the report is

6    due, that's not information that should be available.

7    BY MR. JAROS:

8    Q.    All right.  Let's turn to the Merck v. Apotex

9    litigation.  Did Merck ever tell you they were planning

10   to sue Apotex on the same patent and the same Nasonex

11   product?

12   A.    They told me shortly before your firm contacted me.  I

13   couldn't give a precise date on it, but I think it's the

14   date when documents were submitted to the Court, but I was

15   not told in advance of that.  And to that point, I had no

16   knowledge of it.

17   Q.    Have you reviewed Merck's Amended Complaint in that

18   Merck v. Apotex litigation that's pending?

19   A.    No, I have not reviewed it.

20   Q.    Do you know that Merck alleges that Apotex began

21   selling Canadian product back in March of 2013?

22   A.    I don't recall any details of the new case.

23   Q.    Do you know that Merck alleges that Apotex began

24   selling Australian product in August of 2014?

25   A.    Again, I can't -- I don't recall.

Cockcroft - cross

1    Q.    So you don't know when Merck decided to sue Apotex

2    again?

3    A.    No, I don't.

4    Q.    And finally, Dr. Cockcroft, you received a copy of

5    Apotex's brief to this Court on July 15th of this year; is

6    that right?  I sent it to you.

7    A.    Sorry, yes.  Yes, I did receive that.

8    Q.    All right.  Your declaration to this Court does not

9    cite the Apotex brief; right?

10   A.    If you say so, yes.

11   Q.    And it does not quote the Apotex brief?

12   A.    No.

13   Q.    And your declaration doesn't dispute that you had

14   confidential, protected, privileged and work product

15   information and communications with Apotex's attorneys in

16   that previous litigation, does it?

17   A.    No, I don't dispute that.

18            MR. JAROS:  Thank you, Dr. Cockcroft.

19            THE COURT:  All right.  Anything further?  Any

20   redirect?

21            MR. BARZOUKAS:  No, your Honor.

22            THE COURT:  All right.  You may step down.

23   Thank you.

24            THE WITNESS:  Thank you, your Honor.

25            (Witness excused.)

1            THE COURT:  I don't know whether you each want

2    five minutes for kind of a summary.  Then I will try to get

3    a decision out as soon as I can under the circumstances.

4    Movant first.  Anything from Apotex?

5            MR. JAROS:  Yes, your Honor.

6            MR. BARZOUKAS:  I will reserve my time for after

7    they speak, your Honor.

8            THE COURT:  Yes.  Five minutes each.

9            MR. JAROS:  Yes, your Honor.  I believe the

10   two-part test is very simple to avoid precisely this

11   circumstance where the Court is in a very difficult position

12   to evaluate similarity of technologies, unknown testing

13   against previous testing.  I keep coming back to the

14   two-part test and that it's not disputed and that the facts

15   supporting it are not disputed.

16           In Merck's remarks, they mentioned the Coke

17   case, but they didn't distinguish it.  So we continue to

18   submit Coke says what we say it says.  There are easy cases

19   where the experts are in the same case, clearly a basis for

20   disqualification.  There are more complex fact patterns

21   where the Court can use its discretion and its authority to

22   protect privileged information, and there's no dispute based

23   on what the witness just said that privileged information is

24   at issue here.  The Court has ample discretion to exercise

25   it regardless of a procedural argument.  The point is we

protect privilege with the disqualification and we protect

the integrity of the Court system from the perspective of

the reasonable observer.

Here, we can debate whether the products are the

same.  We don't really know.  We can debate whether the

testing is different.  We don't really know.  We don't need

to know to answer the question and to satisfy the legal

standard.

And with that, your Honor, I'd simply add that

the pending Merck v. Apotex litigation heightens the risk of

everything we've discussed.  We will be sitting in a

situation where we don't know how Dr. Cockcroft will be

used.  We may be litigating against Merck in New Jersey

soon.  If our motion to dismiss is granted, it may be

sometime later.  Merck has assured us that they will sue us

upon launch.  Even if their complaint is dismissed, they

will seek to amend.  They've already asked the Court to do

that.

After they amend, we'll continue fighting.  Our

fight with Merck will continue, and Apotex will be in a

position of having its previous testifying expert on Merck's

side and unavailable to Apotex because, in our view, they

violated not only the clear disqualification standard, but

the discovery confidentiality order in New Jersey, which

limits the use of Apotex's confidential information to that

1    action.

2              Dr. Cockcroft unquestionably, undisputedly, has

3    Apotex confidential information.  Merck is now using Dr.

4    Cockcroft, who in a very real sense has Apotex data, test

5    results, documents and information in his head, using him in

6    this litigation.  We understand Dr. Cockcroft will try to

7    segregate that.  We don't think it's possible for the same

8    reasons that Judge Stark identified in his decision.  We

9    don't think any expert could truly segregate that part of

10   his brain when working on the same compound, the same

11   patent, similar analytical testing.

12             Thank you, your Honor.

13             THE COURT:  All right.  Thank you.

14             MR. BARZOUKAS:  May it please the Court, your

15   Honor, again, this is not an issue of segregation, as you

16   heard the testimony from Dr. Cockcroft himself.  We are

17   dealing with an entirely different analytical tool that

18   couldn't even be conceived at the time of the prior

19   engagement:

20             Apotex's counsel keeps talking about

21   distinguishing the cases on expert disqualifications.  A

22   major distinction is that in every case where an expert has

23   been disqualified, it's because they are coming against

24   their prior party, their prior client.  This is not the case

25   here, and now again they express the fear that somehow they

1    have to be subjected to being against Dr. Cockcroft.  That

2    is not true.  He has not been engaged for a case against

3    them, and if that was the case, they ought to raise that in

4    New Jersey, but that's not the case, your Honor.  Dr.

5    Cockcroft has only been engaged to work against Teva and

6    Amneal.

7            The point that they have not responded to at all

8    is that under the rule of professional conduct for lawyers,

9    your Honor, Rule 1.9A, a lawyer in this case that switched

10   firms, they are correct, and everybody knows this.  They

11   couldn't work against Apotex but they could work against

12   Teva and Amneal.  And I think to impose a duty that is

13   higher than the rules of ethics and conflicts for attorneys,

14   it's not fair to apply that to an expert.

15           And finally, your Honor, I think in some of the

16   questioning I see the motivation for Apotex to raise this

17   issue here, because they have already said that they want

18   any Merck attorney that has talked to Dr. Cockcroft -- they

19   made it very clear there has been no discussion about the

20   Apotex case with Dr. Cockcroft, that they want every Merck

21   attorney that had spoken with Dr. Cockcroft to agree to be

22   disqualified from the New Jersey case.

23           So what I truly believe is happening here and

24   why you're seeing a third party, which there's no case law

25   showing a third party coming in to try to disqualify an

1       expert from another case is they want to get a

2       disqualification and then they want to take that opinion to

3       New Jersey and try to say that any attorney that spoke to

4       Dr. Cockcroft shouldn't be able to represent Merck in New

5       Jersey.  So that's really what I think the motivation for

6       this is, and I think it was revealed during the questioning

7       of Dr. Cockcroft by Mr. Jaros.

8                   Again, your Honor we feel this is an

9       extraordinary measure of relief and we don't believe it's

10      fitting in this case.  Thank you, your Honor.

11                  THE COURT:  All right.  Thank you.

12                  MR. JAROS:  Your Honor, I apologize.  That

13      reminds me of one point I failed to make.

14                  THE COURT:  All right.

15                  MR. JAROS:  Thank you.  We just received their

16      brief and the declaration yesterday morning, so if the Court

17      should find that there's a fact issue or something that

18      hasn't been resolved, we would ask for a deposition of

19      Dr. Cockcroft as well as a reply brief.  We don't see that

20      is necessary because the legal standard is met, but we

21      simply want to let your Honor know that.

22                  On the final point, your Honor, frankly, I don't

23      understand that an attorney could do this, but Dr. Cockcroft

24      can't argue that.  We don't agree that an attorney could do

25      it.  We agree that the same rules of professional conduct as

1    applying the materially adverse test, and here that test

2    seems to be met.  So we have not had a chance to look into

3    that and brief it.  We also see it as irrelevant.  We're not

4    talking about an attorney.  We're talking about an

5    established expert standard.

6              Thank you, your Honor.

7              THE COURT:  All right.  Counsel, thank you very

8    much.  We'll get our work done and get it out to you as soon

9    as we can.

10             (Court recessed at 12:58 p.m.)

11                       -   -   -